[Civ. No. 29833. Second Dist., Div. Three. July 8, 1966.]

JAMES R. BAKER, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, PASO ROBLES BAKERY et al., Respondents.

---

*Assigned by the Chairman of the Judicial Council.

Clare, Bushman & Baldwin and Ted Bushman for Petitioner.

Everett A. Corten, Edward A. Sarkisian, Romaine E. Harper, Spray, Gould & Bowers, Douglas C. Lans, T. Groezinger, Loton Wells, David Green and Harold J. Bennett for Respondents.

FRAMPTON, J. pro tem.*—The petitioner seeks a review and an annulment of a supplemental award of workmen's compensation benefits made to him wherein the Industrial Accident Commission rated his permanent disability, after apportionment, at 55 percent of total permanent disability.

The question presented is whether the finding that "the

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

injury caused permanent disability of 55%, after apportionment . . ." is supported by substantial evidence.

The petitioner filed an application for workmen's compensation benefits wherein he named 23 employers for whom he had worked during the period of time from 1923 to 1961. After the application was filed it was discovered that many of the employers for whom the petitioner had worked had ceased doing business and that their whereabouts were unknown. After such discovery the petitioner elected to and did proceed against four of his former employers, to wit: Paso Robles Bakery, and its workmen's compensation carrier, Guarantee Insurance Company; The Bakery and its workmen's compensation carrier, State Compensation Insurance Fund; The American Bakery and its workmen's compensation carrier, Industrial Indemnity Company, and McCauleys Home Bakery and its workmen's compensation carrier, State Compensation Insurance Fund. (Lab. Code, § 5500.5.)

Proceedings on the claim before the respondent commission resulted in a decision after reconsideration on January 21, 1964. Among other things, the petitioner was awarded continuing temporary disability indemnity jointly and severally against the three insurance carriers, respondents herein, who had insured the four bakeries against whom the petitioner had elected to proceed.

Thereafter, further proceedings were had and on July 8, 1965, the commission issued its supplemental findings and award, finding, amongst other things, that the petitioner's injury resulted in permanent disability of 55 percent, after apportionment. The petitioner sought reconsideration of the award, and the petition for reconsideration was denied.

The petitioner, in his application before the commission, alleged in substance that while working in his occupation as a baker on various dates between the years 1923 and 1961, he sustained an injury arising out of and in the course of his employment, caused by his overexposure to flour dust resulting in his having developed asthma, "or irritation thereto," culminating in emphysema.

The evidence before the commission disclosed the following: Dr. David M. Caldwell, in his report under date of May 20, 1963, stated in part that: "On reviewing your history, there would appear to be no reasonable doubt but that you did develop bronchial asthma approximately 10 years after you began to work in the bakery. The chief allergen in flour is wheat. In his report, Dr. Knight stated that your

intradermal skin test to wheat was 3-plus positive and is significant. It is true that the presence of a positive skin test by no means indicates that such an allergen is the cause of an allergy such as asthma. On the other hand, the test would undoubtedly have been negative if wheat were not the allergen. On page 591, of the text book, 'Non-Tuberculous Diseases of the Chest', published by the American College of Chest Physicians in 1954, the following statement appears: 'Wheat flour can cause asthma by inhalation and dermatitis by contact.' On page 592, of the same volume, flour of wheat is listed as one of the chief allergens in bronchial asthma and rhinitis. Additionally, in the same table, bakers are listed as among those commonly exposed to occupational dust.''

Dr. Caldwell's report of March 4, 1965, contains the following statement: ''In reply to your letter of February 22, 1965, this is to reaffirm that the opinions I expressed to you in my letter of May 20, 1963, have not changed.

''However, in that letter I made the statement that you had told me that you had been a heavy smoker of cigarettes for a number of years. We all know that this can be a contributory factor in chronic pulmonary emphysema. In fact, I have never seen a patient with chronic pulmonary emphysema who did not smoke cigarettes. However, I still believe that the principal contributing factor in your case was the longstanding asthma which I believe was the result of allergy to wheat flour.''

Dr. Alexander Zuckerbraun in his report under date of March 9, 1965, stated: ''I have further studied your history and exposure to wheat flour and dust. It is my opinion that it is very probable that this was the cause of your long standing allergic bronchial asthma. This subsequently progressed to chronic pulmonary emphysema.

''Your pulmonary insufficiency is so severe that it would rule out any employment in the future.''

Dr. Samuel C. Silipo in his report under date of October 28, 1963, stated in part as follows: ''I have examined at your request, Mr. James R. Baker, the applicant in the captioned Industrial Accident case.

''In my opinion, Mr. James R. Baker, has the clinical syndromes of acute and chronic extrinsic bronchial asthma, chronic bronchitis, and chronic obstructive emphysema. It is also my opinion, that the overwhelming primary causes for this present, *chronic* respiratory disease can most reasonably be attributed to the following *major* etiological factors:

''1). His personal habit of smoking 1-1½ packs of cigarettes daily for *forty years*!

"2). His repeated respiratory infections which include 'typhoid pneumonia' at age 6, influenza at approximately age 17-18, a respiratory infection in 1934, 'which laid me up for one week', influenza in the Air Force around 1942, in Atlantic City, New Jersey, alleged pneumonia at age 46, (which the patient denied), pneumonia once again at age 51, and an average of three to four colds per year for several years.

"In my opinion, the major causes of his emphysema are the two cumulative reasons cited above.

"Other aggravating conditions seem to me to be:

"3). His refusal to change jobs when advised by a physician, around 1932, who warned him that continued working in a bakery would probably injure his lungs. Mr. Baker was only about 26 years old at the time and in my opinion should have and might have tried to learn a new trade. He did not heed medical advice and worked in the bakery against medical advice. To be specific, he worked in approximately twenty [-] three bakeries.

"4). He was advised by physicians to stop smoking. He continued to smoke for *forty years,* even to the point of smoking during an interview re: litigation for pulmonary disability.

"5). His reported past, personal habit of chronic alcoholism, resulting in hallucinations and hospitalization suggests a level of general health that would certainly aggravate and encourage his tendency for respiratory disease. The possibility of an aspiration pneumonia under the influence of alcohol could well have set the stage for chronic lung disease.

"6). His move to the Santa Maria area which is foggy and damp and cold, relative to his previous habitat in the San Joaquin Valley.

"7). Finally, we must consider the least important factor in my opinion, namely his extrinsic bronchial asthma—specifically, his allergy to wheat and rye. It is to be noted, that as recently as October 21, 1963, the patient was tested with eight allergens, by Dr. T. K. Hill, of the Santa Barbara Medical Clinic. The patient was allergic to *all eight allergens* and *not just* to *wheat* (3+), and *rye* (1+). He showed *equal reactions* to Fall pollen, (3+), housedust (3+), feathers (2+), hair (1+), and grasses (1-2+). It seems unreasonable to me to assume that his asthma was exclusively a 'wheat and rye asthma'. I feel there is evidence to suggest multiple sensitivities, any one of which could be responsible for any number of attacks of asthma through the years.

"Furthermore, there is no evidence offered that Mr. Baker tried to rearrange his home environment in order to eliminate factors such as avoiding feather pillows, avoidance of wool carpeting, nearness to animals, etc. I further speculate that if Mr. Baker was to be tested for *many* other allergens, he would also probably react positively to *many* of them.

"In view of *all* the factors cited above, and the medical opinions and findings cited below, I feel it would be most unjust to fully ascribe his emphysema to the asthma attacks triggered by the allergens wheat and/or rye. I would favor an apportionment of 10% or less to industrial causation, as only one of the factors in the development of his chronic respiratory disease."

Dr. Silipo in his report under date of April 4, 1965, stated in part as follows: "The patient is unable to perform his previous vocation as a baker, but still would be able to do sedentary work, either full time or part time.

"I would assign as the primary causes for his chronic lung disease the following factors:

"1. His personal habit of smoking cigarettes daily for over 40 years.

"2. His repeated respiratory infections which he admitted to in a prior report.

"3. His refusal to change jobs when advised by a physician in 1932, who warned him that continued working in a bakery would 'probably injure his lungs.'

"4. His alledged [*sic*] past personal habit of chronic alcoholism which at one time resulted in hallucinations and hospitalization. This suggests a level of general health that would aggravate and encourage a tendency toward respiratory disease. The possibility of an aspiration pneumonia under the influence of alcohol could well have set the stage for future chronic disease.

"5. His habits of sleeping in a relatively cool bedroom at night in an area which is known to be quite foggy, damp, and cold. This is in marked contrast to his previous habitat in the San Joaquin Valley.

"6. His extrinsic bronchial asthma may also have played a part in the development of his chronic lung disease. It is noted, however, that the patient is allergic to at least eight allergens (see previous report) and not just to wheat and rye.

"It is also noted that between 1963 and 1965, the patient has continued to deteriorate pulmonary-wise both subjectively

and objectively. He has done this despite the fact that he has not been in contact with the wheat and rye allergens in an industrial setting, such as a bakery. This latter observation may be one to conclude that deterioration of pulmonary function is more a function of infection and personal air pollution in the form of smoke than it is to the mere sensitivity to one or two allergens.

"In view of the factors cited above, I would favor an apportionment of 10% or less to industrial causation as a factor in the development of his respiratory disease. In my opinion, the industrial causation for this patient's lung disease is the least important factor among multiple causal agents.

"Since 1963, The Surgeon General's Office has published a book on 'Smoking and Health.' I quote from page 299 of this very recent report.

" 'The population at risk from occupational exposure is relatively small compared to the population of cigarette smokers. Among occupational groups, cigarette smoking is an important variable that must be considered in all studies of chronic pulmonary disease. In most studies, but not all, the relative importance of cigarette smoking is greater than occupational exposures in the production of symptoms and signs of chronic bronchitis or emphysema.'

"Again quoting from the same Surgeon General's report on page 280 : 'Chronic bronchitis and emphysema probably represent disorders of *multiple* causality.' "

Dr. Paul Cook in his report under date of March 10, 1965, stated in part as follows : "The history of this applicant[']s case is well known to you. He complains of cough and shortness of breath. This is almost constant. Patient states that he coughs a great deal and that the cough is not productive. He further states that his appetite is poor and, at times, notices chest pains. In reply to my query on smoking, he stated that he smokes from six to eight cigarettes a day.

"Physical examination revealed a rather thin 59 year-old male appearing in rather poor health. His temperature was 98.6 degrees, pulse 80, respirations 20, Blood Pressure 138/90. His height was 5' 8" and his weight was 149½ pounds. He appeared to be rather dyspneic. There was marked Bilateral Arcus Senilis. His teeth were in very poor repair, revealing numerous caries. Auscultation of the chest revealed numerous moist wheezing rales throughout. The heart was regular to rate and rhythm, there were no thrills or murmurs, Gastro-Intestinal examination revealed no abnormalities. On examination

of the fingernails I found a slight degree of cyanosis. He has slight varicose veins involving both lower legs. The skin of the forearms revealed several ecchymotic areas.

"Report of the Chest X-Ray taken January 28, 1965, was as follows:

"Extensive bilateral bullous emphysema and mild pulmonary fibrosis. No change in the appearance of the heart or lungs since last study of 9-4-64. Conclusion was Bullous Pulmonary Emphysema.

"May I state that his condition appears about the same as when I examined him on September 8, 1965 [*sic*; 1964].

"I am unable to state just how much of his condition is industrial and how much is non-industrial."

Dr. Kenneth L. Clay in his report under date of January 20, 1965, stated in part as follows: "I feel that Mr. Baker's heavy smoking, over a period of many years, has been probably the major factor in producing his pulmonary emphysema.

"Most authorities on this subject consider smoking as a very important etiological agent in the production of pulmonary emphysema. Emphysema is seldom seen in people who are not cigarette smokers."

Dr. William F. Oliver in his report under date of February 23, 1965, stated in part: "In addition to the above history and physical examination, I have reviewed the following material which is pertinent to this case. 1) a report to Mr. Fred Lynch dated 2-1-63 by myself. 2) a brief letter dated 2-25-63 also to Mr. Lynch also written by myself. 4) [*sic*] a letter to Mr. James R. Baker dated May 20, 1963, by Dr. David M. Caldwell, M. D. 5) a letter dated June 11, 1963, to Mr. Fred Lynch from David M. Caldwell, M. D. 6) a report of complete examination dated October 23, 1963, by S. C. Silipo, M. D. together with two very brief additional reports from the same man dated October 29 and 30, 1963. 7) a letter to Mr. Baker dated December 3, 1963, from John H. Woodbridge, M. D. 8) a letter dated September 8, 1964, to the Manhattan Guarantee Insurance Companies from Paul Cook, M. D. 9) a letter dated September 23, 1964, to Mr. Baker from David Caldwell, M. D. 10) a letter dated January 12, 1965, from Kenneth Clay, M. D. to the State Compensation Insurance Fund. 11) a letter dated January 20, 1965, to the State Compensation Insurance Fund from Kenneth L. Clay, M. D.

"On the basis of all of this it would be my opinion that the above-captioned patient suffers from moderately advanced bullous pulmonary emphysema. In addition, on the basis of history, the patient is known to have had extrinsic asthma and at

the present time he suffers in addition to these two conditions from some malnutrition, external hemorrhoids, and a chronic anxiety reaction. As to treatment of this man, it would be my opinion that he should certainly stop the use of tobacco entirely and there should in addition be medical supervision of this man's pulmonary pathology as regards medication and other symptomatic and supportive therapy. As to my opinion as to the relationship between this man's present condition and the original exposure I find it to be unchanged from my report dated February 1, 1963, wherein in my discussion I state: 'In other words, I think that the degree of industrial causation as to this patient's asthma which might then be assumed to be a factor in the production of the emphysema, while not deniable would be of a rather insignificant nature.' The same opinion was expressed by myself in a letter to Mr. Fred P. Lynch, dated March 25, 1963, wherein I state: 'I believe that on the basis of the additional information contained therein that you have some reason to suggest an industrial cause as a minor contributing factor to this patient's pulmonary pathology.' Both of these conclusions being based upon the fact that Mr. Baker demonstrated an allergic response to a multitude of substances, among which were rye and wheat. On the basis of submitted data, it would be my opinion that Mr. Baker's condition is now permanent and stationary to the extent that such a disease process becomes such. It is to be noted that there has been no change in this man's pulmonary function studies between May of 1963 and September of 1964; as to work capacity at the present time I am in accordance with the report rendered by Kenneth Clay, M. D., dated January 12, 1965, wherein he states: 'I feel his condition is permanent and stationary and feel that he can do light work, sedentary type work not involved in any prolonged climbing, walking or physical exertion.' As to the factors of apportionment in the case which are valid in my opinion, I believe that the following may be said: By and large, this man's present respiratory difficulty represents in my opinion the culmination of a series of factors including excessive cigarette smoking his reported past history of chronic alcoholism and all of [sic] this implies as regards an individual's general health and well being, his voluntary complete and total disregard for medical advice dating back to 1932, and finally, he demonstrated allergy to a wide variety of substances which, however, included wheat and rye. I think it important to recognize that of some of the other allergens tested the patient showed equally strong reactions to fall pollens and house dust

with some reaction to feathers and grasses, thus the reason for my prior conclusion that this man's exposure to wheat and rye in his occupation as a baker could only be considered as a minor contributing factor to his present pulmonary pathology. In other words, giving this patient every benefit of the doubt, I cannot see how his occupation as a baker could be considered as contributing to his present pulmonary pathology beyond a factor of 5%. In other words, it is my opinion that Mr. Baker's present pulmonary pathology is due in at least 95% to factors ennumerated [*sic*] above excluding his demonstrated allergy to wheat and rye.''

The opinion of the referee on ''Supplemental Findings and Award'' contains amongst other things the following statement: ''It is noted that the defendants have presented medical evidence from apparently competent and honest witnesses that tend to fix applicant's disability due to injury at minimum. On the other hand, Dr. Caldwell, a noted lung specialist, in his report dated March 4, 1965, attributed a major portion of applicant's disability to his long-standing asthma which he believes to be caused by allergy to flour. Most defendants' witnesses ignore this point and assume that asthma was not caused by employment.

''Dr. Zuckerbraun, also testifying more favorably toward applicant tended to disagree more sharply with the witnesses for the defense, particularly as to the proven contribution of cigarette smoking. The opinion that 55% of applicant's disability is due to industrial causes represents a judgment between two rather extreme positions of the medical experts, leaning slightly upon the opinion of Dr. Caldwell.''

It is apparent from the foregoing partial summary of the evidence that the referee based his decision to apportion the award upon a conflict in the evidence. Had the referee adopted the etiology relating to the petitioner's condition of health as was set forth in the reports of Drs. Caldwell and Zuckerbraun, apportionment would have been improper, for it appears from their reports that they felt that the petitioner's asthma was caused solely from his exposure to flour dust and that his continued exposure thereto culminated in emphysema. The other medical doctors did not agree with this conclusion and felt that petitioner's condition was primarily related to causes other than exposure to flour dust. In fact, they felt that his exposure to flour dust made a very minor contribution to the petitioner's condition. This conflict in the evidence was before the commission when it adopted the report of the trial referee and denied the petition for reconsideration.

■ It is the function of the commission, as the trier of the facts, to determine as a fact the proximate cause of the injury. Its finding in this regard, if supported by any evidence, cannot be disturbed by this court. (*Limited Mutual Comp. Ins. Co.* v. *Industrial Acc. Com*, 37 Cal.App.2d 50, 53 [98 P.2d 837]; *State Comp. Ins. Fund* v. *Industrial Acc. Com.*, 176 Cal.App.2d 10, 13 [1 Cal.Rptr. 73]. See also *Rogers Materials Co.* v. *Industrial Acc. Com.*, 63 Cal.2d 717, 721 [48 Cal.Rptr. 129, 408 P.2d 737].) ■ " 'Whether a disability results in whole or in part from "the normal progress of a preexisting disease" [citation] or represents a fully compensable lighting up or aggravation of a preexisting condition is a question for the commission to determine, and its award will not be annulled if there is any substantial evidence to support it.' (*Argonaut Ins. Co.* v. *Industrial Acc. Com.*, 57 Cal.2d 589, 593 [21 Cal.Rptr. 545, 371 P.2d 281] )" (*Fred Gledhill Chevrolet* v. *Industrial Acc. Com.*, 62 Cal.2d 59 at p. 61 [41 Cal.Rptr. 170, 396 P.2d 586].)

■ In making its determination "The trier of fact may accept the evidence of any one expert or choose a figure between them based on all of the evidence." (*Liberty Mutual Ins. Co.* v. *Industrial Acc. Com.*, 33 Cal.2d 89, 94 [199 P.2d 302].)

■ The evidence before the commission sustains the finding that the petitioner suffers from a disability which derives from both industrial and nonindustrial causes. ■ The employer is liable only for that part of the overall disability which is reasonably attributable to industrial causation. Separation of the industrial cause from the nonindustrial cause was a matter for the determination of the commission based upon the evidence before it. (*Argonaut Ins. Co.* v. *Industrial Acc. Com.*, 57 Cal.2d 589, 593 [21 Cal.Rptr. 545, 371 P.2d 281].) The evidence, as has already been pointed out, ranged widely on the question of causation. The resolution of this question resulted in a substantial award to the petitioner and such award is supported by the evidence.

The petitioner urges that the permanent disability rating specialist found him to be 100 percent disabled based upon facts submitted to him by the trial referee and that there is therefore an inconsistency between the 100 percent disability recommended by the disability rating expert and the 55 percent disability, after apportionment, as found by the commission.

Title 8, California Administrative Code, section 10791* pro-

*(Now § 10602 of new ch. 4.5 of Tit. 8 effective Jan. 27, 1966. See also Stats. 1965, ch. 1513, p. 3555.)

vides that: "The reports of permanent disability rating specialists of the commission shall be deemed to constitute evidence only as to the relation between the factors of disability and the percentage of permanent disability therein contained. Such report, however, shall not be deemed to constitute evidence as to the existence of any of the factors of disability."

The permanent disability rating specialist filed his report in which he recommended a rating of 100 percent based upon the following information furnished by the trial referee: "Date of injury: 1923 to 1-9-61. Age at injury: 55. Compensation rate: $52.50. Occupation: Baker. Lung impairment. Unable to do other than sedentary work and unable to do this 3 hours per day."

Under these circumstances and under the provisions of then section 10791 of the Administrative Code the permanent disability rating expert, by his report, had provided evidence only that if all of the factors of disability presented to him by the trial referee were produced by an industrial injury, such injury caused a disability of 100 percent. ■ However, as heretofore pointed out, the commission found upon substantial evidence that all of the factors leading to the petitioner's disability were not produced by an industrial injury and based upon such finding the commission properly apportioned his disability.

The award is affirmed.

Ford, J., and Kaus, J., concurred.