[No. A077571. First Dist., Div. Three. Feb. 25, 2000.]

NGOC HAI THI PHAM, an Incompetent Person, etc., Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD, CONCORDE FRENCH BAKERY, INC., et al., Respondents.

Nakata & Tower and Kenneth M. Nakata for Petitioner.

Laughlin, Falbo, Levy & Moresi, Patricia E. Gould and Michael W. Laughlin for Respondents Concorde French Bakery, Inc., and Fremont Compensation Insurance Company.

## OPINION

**WALKER, J.**—The sole issue before this court is the proper method to use for calculating petitioner applicant Ngoc Hai Thi Pham's "average weekly earnings" pursuant to Labor Code section 4453 in order to determine her correct rate of weekly temporary total disability indemnity payments under section 4653.[1] We conclude that the Workers' Compensation Appeals Board (Board) has improperly utilized subdivision (c)(4) of section 4453 in order

---

[1] All further statutory references are to the Labor Code unless otherwise noted. Section 4653 prescribes indemnity for temporary total disability at weekly rates of two-thirds of the injured employee's average weekly earnings.

Section 4453 provides in pertinent part: "(a) In computing average annual earnings for the purposes of temporary disability indemnity and permanent total disability indemnity only, the average weekly earnings shall be taken at: [¶] . . . [¶]

"(6) Not less than one hundred sixty-eight dollars ($168) for permanent total disability, and for temporary disability, not less than the lesser of one hundred eighty-nine dollars ($189) or 1.5 times the employee's average weekly earnings from all employers, nor more than six hundred seventy-two dollars ($672) for injuries occurring on and after July 1, 1995.

[¶] . . . [¶]

"(c) Between the limits specified in subdivisions (a) and (b), the average weekly earnings, except as provided in Sections 4456 to 4459, shall be arrived at as follows: [¶] *(1) Where the*

to justify its erroneous computation of average weekly earnings at the time of injury based solely on the fact that applicant was laid off nine days later by respondent employer Concorde French Bakery, Inc. (Bakery). We vacate the Board's decision and hold that applicant's actual earnings at the time of injury accurately reflect both her average weekly earnings under subdivision (c)(1) and (2), as well as her average weekly earning capacity under subdivision (c)(4), for purposes of properly calculating her temporary disability indemnity entitlement under section 4453.

## FACTUAL BACKGROUND

The pertinent facts are undisputed. Applicant, while employed by Bakery as a baker foreman on August 22, 1995, at the age of 35, sustained a work-related injury to her head and psyche, rendering her totally temporarily disabled commencing on August 23, 1995, and continuing. At the time of trial on July 15, 1996, applicant had been unable to communicate and care for herself since the injury. She was unable to respond to questioning by the workers' compensation administrative law judge (WCJ) and was deemed incompetent to testify.

Applicant had been employed by Bakery since 1984. At the time of her injury on August 22, 1995, applicant was working 48 hours, six days per

---

*employment is for 30 or more hours a week and for five or more working days a week, the average weekly earnings shall be the number of working days a week times the daily earnings at the time of the injury.* [¶] *(2) Where the employee is working for two or more employers at or about the time of the injury, the average weekly earnings shall be taken as the aggregate of these earnings from all employments computed in terms of one week; but the earnings from employments other than the employment in which the injury occurred shall not be taken at a higher rate than the hourly rate paid at the time of the injury.* [¶] (3) If the earnings are at an irregular rate, such as piecework, or on a commission basis, or are specified to be by week, month, or other period, then the average weekly earnings mentioned in subdivision (a) shall be taken as the actual weekly earnings averaged for this period of time, not exceeding one year, as may conveniently be taken to determine an average weekly rate of pay. [¶] *(4) Where the employment is for less than 30 hours per week, or where for any reason the foregoing methods of arriving at the average weekly earnings cannot reasonably and fairly be applied, the average weekly earnings shall be taken at 100 percent of the sum which reasonably represents the average weekly earning capacity of the injured employee at the time of his or her injury, due consideration being given to his or her actual earnings from all sources and employments.*
"(d) Every computation made pursuant to this section beginning January 1, 1990, shall be made only with reference to temporary disability or the permanent disability resulting from an original injury sustained after January 1, 1990. However, all rights existing under this section on January 1, 1990, shall be continued in force. Except as provided in Section 4661.5, disability indemnity benefits shall be calculated according to the limits in this section in effect on the date of injury and shall remain in effect for the duration of any disability resulting from the injury." (Italics added.)

week for Bakery, with occasional overtime. Additionally, applicant was working 22 hours, seven days per week (four hours per day), at a second job for Bonami Country and Catering (Bonami), another French bakery. Applicant had worked for Bonami as a baker since March 1, 1995. In 1995, prior to the industrial injury, applicant earned $14,297.74 from Bakery, and $5,620 from Bonami, totaling $19,917.77.

In 1994, applicant's earnings from Bakery were $16,129.48, and she earned $14,052.40 working another part-time job for Monte G. Bish. In 1993, applicant's earnings from Bakery were $23,669.15. Additionally in 1993, she earned $16,277.38 from her part-time job with Monte G. Bish and $1,270.72 from a third part-time job with Robertson Harness.

At the time of her industrial injury in 1995, applicant's combined actual earnings, projected over a 52-week period, resulted in an average weekly earnings figure of $651.51, from which $426.80 per week consisted of earnings from Bakery and $224.71 from Bonami. It was undisputed that two-thirds of the combined average weekly earnings yielded a weekly temporary disability indemnity rate of $434.34. Bakery paid applicant temporary total disability at this rate for the period from August 23, 1995, until August 31, 1995, when applicant was laid off as a result of company downsizing and reorganization.[2]

Commencing on September 1, 1995, and thereafter, the WCJ computed applicant's average weekly earnings to reflect an earning capacity based exclusively on her projected earnings from her part-time job at Bonami. Accordingly, applicant's weekly temporary total disability indemnity payment was lowered from $434.34 to $149.87.

---

[2] By letter dated August 30, 1995, applicant was informed by Bakery owner, Thomas F. Tyson, that her position was eliminated and she was laid off due to lack of work, as a result of downsizing and reorganizing at Bakery. At trial, Bakery claimed applicant had been given verbal notice of the layoff prior to her industrial injury. However, the WCJ, upheld by the Board, specifically found that Bakery had not verbally communicated to applicant prior to her injury that she was going to be laid off. Tyson's letter dated August 30, 1995, stated as pertinent: "We are downsizing and reorganizing the Bakery, and changes are being made in the work force as a result. [¶] Since we will no longer be baking, we will no longer be in need of an extended work force. Your position has thus been eliminated due to lack of work. [¶] I am sorry to have to give you this news, and wish you well in your efforts to find other employment. [¶] Good luck, and thank you very much for your contributions to Concorde French Bakery, Inc."

The specific matter of the layoff is the subject of a separate claim filed by applicant for benefits alleging violation of section 132a. We do not know whether this issue has been adjudicated. It is not currently before this court on review.

## BOARD DECISION AFTER RECONSIDERATION

On February 13, 1997, the Board in a two-to-one decision, having granted reconsideration, agreed with the WCJ's earnings determinations.[3] The WCJ had opined: "Given [a coworker's] testimony regarding [the coworker's] lay off from employment with defendant as well as the notice of job layoff represented by the August 30, 1995 letter of Thomas F. Tyson to applicant . . . , there is ample evidence that applicant would not have been employed by defendant after August 31, 1995. It would be speculative to conclude that she would have found additional employment immediately after that date. As pointed out by [Bakery], the evidence regarding earnings shows a decrease in earnings between 1993 and 1995."[4] The Board, relying exclusively on the fact of applicant's postinjury layoff by Bakery and her anticipated wage loss from Bonami, also applied subdivision (c)(4) of section 4453 to ascertain that applicant's average weekly earning capacity entitled her to a weekly temporary total disability payment of $149.87. Without any further explanation or evidentiary substantiation, the Board majority (Commissioners Heath and Ruggles) simply reiterated the WCJ's opinion, concluding that "it would be speculative on this record to determine that applicant would have found employment following the layoff on August 31, 1995, and that such employment would have provided her with an equivalent income to her salary with defendant employer."

Commissioner Gannon dissented. "Because applicant was employed on a full-time basis, her average weekly earnings should be based on her actual earnings at the time of injury," according to subdivision (c)(1) and (2) of section 4453. Applicant's average weekly earnings at the time of injury, concluded Commissioner Gannon, entitled her to a temporary disability indemnity rate of $434.34 per week. Furthermore, opined Commissioner Gannon, even if applicant's average weekly earnings were calculated according to her "earning capacity" under subdivision (c)(4) of section 4453, the Board majority failed to consider all relevant factors, including applicant's "age, health, skill, education, willingness to work, and employment opportunities." He pointed to the evidence, which demonstrated applicant's ability and willingness to work in spite of her layoff, emphasizing that she

---

[3]The WCJ's initial finding that the temporary disability rate for this period was $406 was corrected and amended by the Board to $434.34.

[4]To be more accurate, the record actually indicates that applicant's total earnings in 1993 were $41,217.52. In 1994, she earned a total of $30,181.88. In 1995, based on her projected earnings over a 52-week period, notwithstanding the fact of layoff, applicant would have earned $33,878.52 but for the industrial injury. Interestingly, in 1993 applicant earned $23,669.15 from Bakery. In 1994, she earned $16,129.48 from Bakery, and but for the injury and subsequent layoff, applicant's projected earnings from Bakery in 1995 totaled $22,193.60.

had been working 48 hours per week for Bakery as well as maintaining the 20-hour per week part-time job at Bonami. Applicant's willingness to work, emphasized Commissioner Gannon, was "extremely high." He concluded: "On this record, the amount applicant earned at her second job, $224.80 per week, does not accurately predict what applicant's earnings would have been absent the present industrial injury. A reasonable and fair determination of applicant's earning capacity is reflected in applicant's earnings at the time of injury. Therefore, . . . I would amend the [WCJ's] decision to reflect that applicant's average weekly earnings through the period of temporary disability are $651.51 and that $434.34 is the correct rate for payment of temporary disability indemnity."

## DISCUSSION

### I

Under section 4653, the disability payments for temporary total disability are computed as two-thirds of the "average weekly earnings" during the period of such disability.[5] In turn, the "earning capacity" (or average weekly earnings) is determined under section 4453. In most cases, the statutory idiom, "average weekly earnings," either represents or is 100 percent of an injured employee's aggregate weekly earnings from all employments at the time of injury. Subdivision (a) of section 4453 specifies the maximum and minimum levels for average weekly earnings for specified dates of injury. These sums in turn determine the maximum and minimum weekly compensation rates.[6]

Within these limits, the method of computation of average weekly earnings is provided in section 4453, subdivision (c), based on the type of employment. Subdivision (c)(1)-(3) provides formulae which take an employee's actual earnings as a starting point. ▮ Regardless of which

[5]Section 4653 provides in full: "If the injury causes temporary total disability, the disability payment is two-thirds of the average weekly earnings during the period of such disability, consideration being given to the ability of the employee to compete in an open labor market."

[6]Until 1990 the calculation of average weekly earnings for temporary and permanent disability payments was subject to a minimum and maximum statutory limit. (§ 4453, subd. (a).) (See generally 1 St. Clair, Cal. Workers' Compensation Law and Practice (5th ed. 1996) § 7.5, pp. 404-406.) The floor respecting minimum earnings for temporary disability purposes was eliminated by the Legislature for injuries on or after January 1, 1991, as part of the ongoing 1989 reform legislation and subsequent amendments and cleanup legislation. (Stats. 1990, ch. 1550, § 29, p. 7275 [§ 4453, subd. (c)]; Stats. 1993, ch. 121, § 37, pp. 1281-1282 [§ 4453, subd. (a)(5)-(7)].) Rather than a floor for minimum earnings, subdivision (a)(4) through (7) now provides that average weekly earnings are to be not less than the lesser of $189 or 1.5 times the average weekly earnings of the employee from all employers. The limits for applicant's average weekly earnings are set forth in subdivision (a)(6) of section 4453.

provision of subdivision (c) of section 4453 is used, "earning capacity" remains the benchmark for calculating average weekly earnings at the time of injury. (*West v. Industrial Acc. Com.* (1947) 79 Cal.App.2d 711, 722 [180 P.2d 972] [earning capacity is "touchstone" in determining average earnings]; accord, *Gonzales v. Workers' Comp. Appeals Bd.* (1998) 68 Cal.App.4th 843, 846 [81 Cal.Rptr.2d 54].) The Supreme Court has declared that the phrase "[e]arning capacity is not locked into a straitjacket of the actual earnings of the worker at the date of injury; the term contemplates [the employee's] general over-all capability and productivity; the term envisages a dynamic, not a static, test and cannot be compressed into earnings at a given moment of time." (*Goytia v. Workers' Comp. Appeals Bd.* (1970) 1 Cal.3d 889, 894 [83 Cal.Rptr. 591, 464 P.2d 47].)

In the ordinary and usual case of the permanent and full-time employee, the standard application of the first three statutory methods of subdivision (c)(1)-(3) will result in "actual earnings" equivalent to "earning capacity" under subdivision (c)(4). (*Argonaut Ins. Co. v. Industrial Acc. Com.* (1962) 57 Cal.2d 589, 594 [21 Cal.Rptr. 545, 371 P.2d 281] (*Montana*); *Goytia v. Workmen's Comp. App. Bd.*, *supra*, 1 Cal.3d 889, 894; see generally 1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 1999) § 6.02[2], pp. 6-9 to 6-10.) Subdivision (c)(4) of section 4453, on the other hand, is for irregular employment or other situations where the first three formulae do not yield a fair result and require an estimate of earning capacity from all relevant circumstances, not just past earning history or actual earnings at the time of injury. (*Montana*, *supra*, 57 Cal.2d at pp. 594-595; *Goytia*, *supra*, 1 Cal.3d at pp. 894-895; *Gonzales v. Workers' Comp. Appeals Bd.*, *supra*, 68 Cal.App.4th at p. 847.)

In the leading case of *Montana*, the Supreme Court addressed the questions of "average weekly earnings" and "earning capacity" under section 4453 where a 50-year-old employee, although employed full time at the time of his industrial injury, previously had worked intermittently over a period of five years as a construction laborer and had earned less than $1,300 in the 15 months prior to his injury. The court upheld the Board's finding that Montana's average weekly earnings were maximum for the temporary disability award, notwithstanding his unimpressive evidence of actual earnings and earning history at the time of injury. Subdivision (c)(4) of section 4453, emphasized the court, *"is to equalize for compensation purposes the position of the full-time, regularly employed worker whose earning capacity is merely a multiple of his daily wage and that of the worker whose wage at the time of injury may be aberrant or otherwise a distorted basis for estimating true earning power."* (*Montana*, *supra*, 57 Cal.2d at p. 594, italics added.) The court continued: "[A]ll facts relevant and helpful to making the estimate

must be considered. [Citations.] The applicant's ability to work, his age and health, his willingness and opportunities to work, his skill and education, the general condition of the labor market, and employment opportunities for persons similarly situated are all relevant." (*Id.* at p. 595.)[7]

▮ Turning to the case before us, the Board relied solely on the fact of the postinjury layoff to justify its utilization of subdivision (c)(4) of section 4453 to limit applicant's average weekly earnings to those based on the part-time wages that she would have continued to earn at her second job at Bonami. With all due respect to the Board's expertise in the arena of workers' compensation, we must disagree here with its interpretation of its governing statute, a question of law ultimately for this court. (*State Compensation Ins. Fund v. Brown* (1995) 32 Cal.App.4th 188, 199 [38 Cal.Rptr.2d 98]; *Western Electric Co. v. Workers' Comp. Appeals Bd.* (1979) 99 Cal.App.3d 629, 644 [160 Cal.Rptr. 436].) ▮ In deciding that the Board should have relied on subdivision (c)(1) and (2), we are mindful that a statute should not be given a construction that results in rendering one of its provisions nugatory. (*Leeth v. Workers' Comp. Appeals Bd.* (1986) 186 Cal.App.3d 1550, 1556 [231 Cal.Rptr. 468].) It is a cardinal rule of statutory construction that in attempting to ascertain the legislative intention, effect should be given as often as possible to the statute as a whole and to every word and clause, thereby leaving no part of the provision useless or deprived of meaning. (*Ibid.*) In reviewing the Board's action in this case, it is our

---

[7]Although the Supreme Court in *Montana* annulled the Board's award of maximum permanent disability indemnity using the same criteria for construing the term "earning capacity," it is not relevant in the case at bar because (1) only temporary disability is an issue and (2) applicant's earning capacity would be the same. However, we note the court did make an important distinction, often confused by litigants as well as appellate courts, when it opined as follows: "An estimate of earning capacity is a prediction of what an employee's earnings would have been had he not been injured. Earning capacity, for the purposes of a temporary award, however, may differ from earning capacity for the purposes of a permanent award. In the former case the prediction of earnings need only be made for the duration of the temporary disability. In the latter the prediction is more complex because the compensation is for loss of earning power over a long span of time. Thus an applicant's earning capacity could be maximum for a temporary award and minimum for a permanent award or the reverse. Evidence sufficient to sustain a maximum temporary award might not sustain a maximum permanent award. In making an award for temporary disability, the [Board] will ordinarily be concerned with whether an applicant would have continued working at a given wage for the duration of the disability. In making a permanent award, long-term earning history is a reliable guide in predicting earning capacity, although in a variety of fact situations earning history alone may be misleading." (*Montana, supra,* 57 Cal.2d at pp. 594-595.) The former is intended "primarily to substitute for the worker's lost wages, in order to maintain a steady stream of income," while the latter "has a dual function: to compensate both for actual incapacity to work and for physical impairment of the worker's body . . . ." (*J. T. Thorp, Inc. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 327, 333 [200 Cal.Rptr. 219]; accord, *Nickelsberg v. Workers' Comp. Appeals Bd.* (1991) 54 Cal.3d 288, 294 [285 Cal.Rptr. 86, 814 P.2d 1328].)

responsibility to construe the relevant subdivisions of section 4453 so that effect is given to all provisions, leaving no part superfluous or inoperative, void or insignificant and to make certain that one subdivision will not destroy another. (*Ibid.*; *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

Here, these principles require that meaning be given to section 4453, subdivision (c)(1), (2) and (4). The language of subdivision (c)(1) is explicit and direct, providing that where an injured employee is employed "30 or more hours a week and for five or more working days a week, the average weekly earnings *shall* be the number of working days a week times the daily earnings *at the time of the injury*." (Italics added.) Thus, the initial error on the Board's part was to use subdivision (c)(4) to calculate applicant's average weekly earnings at the time of the layoff rather than at the time of the injury, as required by long-standing, unequivocal statutory language. However, on this record, there is no justification for the Board's use of subdivision (c)(4). Even if we assume that the fact of the postinjury layoff justifies calculating applicant's average weekly earnings under subdivision (c)(4), here, applicant's "earning capacity" is indistinguishable from her "actual earnings" under subdivision (c)(1) and (2) at the time of injury for purposes of determining her weekly temporary total disability indemnity entitlement. The end result is the same. We need only examine the *Montana* factors in light of the undisputed, rather significant record in evidence before us. That is, *Montana* obliges the Board and now this reviewing court to review applicant's elements of earning capacity, which include ability to work, willingness to work, and opportunity to work when subdivision (c)(4) is utilized. (*Gonzales v. Workers' Comp. Appeals Bd.*, *supra*, 68 Cal.App.4th at p. 847.)

 "Ability to work" includes such factors as age and health and any specific training an employee may possess. (*Montana*, *supra*, 57 Cal.2d at p. 595.) Applicant was young, 35 years old, at the time of injury. There is no evidence that her health had interfered with her ability to work a full-time job with overtime, but also to hold part-time jobs. She had a minimum of 20 to 30 years to remain competitive in the labor market given her age. If applicant had experienced any past health problems, and there is no evidence that she did, they certainly did not interfere with her ability to work. At the time of injury, she worked for Bakery for 48 hours, six days per week with occasional overtime, *and* for Bonami for four hours per day for seven days totaling 22 *additional* hours per week. Applicant was able to, and in fact did, work 70 hours per week at the time of her injury. Certainly, applicant's qualifications or specific training necessary to work in the bakery business speaks for itself. She had worked as a baker for more than 10 years when she

was injured. At the time of injury, she had two jobs as a baker with two different baking companies.

"Opportunity to work" takes into account the general condition of the labor market and employment opportunities for persons similarly situated. (*Montana, supra*, 57 Cal.2d at p. 596.) In addition to her job at Bakery, applicant was holding a part-time job at Bonami as a baker. There is no evidence that she would not have continued at Bonami, and based on her history, there is every reason to believe that she would have found additional employment to replace her earnings loss after the layoff at Bakery.

"Willingness to work" considers whether an employee makes a practice of working only during a limited period of seasonal activity, and, if so, it is improper to base a computation of average weekly earnings solely on the employee's current earnings. (*Montana, supra*, 57 Cal.2d. at pp. 595-596.) In the case at bar, the Board has completely ignored willingness to work, designated applicant a seasonal worker de facto and in effect treated the postinjury layoff as the equivalent of the end of seasonal employment. (See, e.g., *Westside Produce Co. v. Workers' Comp. Appeals Bd.* (1978) 81 Cal.App.3d 546, 552 [146 Cal.Rptr. 498] [temporary disability benefits for seasonal worker based on earnings at time of injury awarded only for period employment would have continued with further payments based on past earning history and anticipated future earnings].) However, unlike this case, in *Westside Produce Co.*, it was unrefuted that employee Avila was hired as a seasonal worker whose seasonal employment would have ended on January 28, 1977, shortly after her industrial injury was sustained on January 21, 1977. (*Id.* at pp. 549, 552.) The Board nonetheless awarded Avila temporary disability based solely upon the high earnings at the time of injury, even for the period after the seasonal employment would have terminated. The appellate court reversed the Board and properly analyzed the situation under section 4453, former subdivision (d), now subdivision (c)(4). Avila, observed the court, would not have continued working at the given wage for the duration of disability because of the seasonal nature of the produce industry and the undisputed evidence that seasonal earnings within specified periods of employment time represented her earning capacity, not the actual earnings she was making at the time of injury. The court then looked at Avila's 1976 tax return and calculated her average weekly earnings based upon her seasonal earnings history for the one year prior to the industrial injury. (*Westside Produce Co., supra*, 81 Cal.App.3d at p. 553.)

Here, we have the reverse situation. Applicant categorically was *not* a seasonal worker at the time of injury nor at the time of the postinjury layoff. She was a full-time permanent employee. Applicant's actual earnings and

earnings history at the time of injury were not an aberration, but unquestionably reflective of her earning capacity. In fact, applicant's work history reveals an extraordinary willingness to work. At the time of her injury in 1995, she was working 70-plus hours a week at two jobs. In 1994, the year prior to her injury, applicant also worked two jobs, and in 1993, she worked three jobs. It is difficult to conceive of a factual scenario presenting an employee more able, motivated and willing to work than the one before this court. The fact of her ill-fated industrial injury, followed nine days later by a company layoff, neither eliminates nor denigrates the impressive component of applicant's willingness to work in the earning-capacity calculus. If the postinjury layoff were a factor to be considered, its effect on this record is at best de minimis.

In the recent Third Appellate District decision in *Gonzales,* the issue before the court was whether the injured employee's voluntary decision to retire permanently after an industrial injury implicated the element of willingness to work in the earning-capacity calculus, where she also was seeking temporary disability indemnity payments. *Gonzales* determined that it did, opining as follows: "[T]he primary factual component of the analysis must be whether the worker is retiring for all purposes, or only from the particular employment. (See *Van Voorhis v. Workmen's Comp. Appeals Bd.* (1974) 37 Cal.App.3d 81, 90 [112 Cal.Rptr. 208] ['matter of common knowledge' people often work at other jobs after retirement].) If the former, then the worker cannot be said to be willing to work, and earning capacity would be zero. If the latter, then it would be necessary to determine an earning capacity from all the evidence available. A subsidiary question is whether the decision to retire is a function of the job-related injury. If the injury causes the worker to retire for all purposes or interferes with plans to continue working elsewhere, *then the worker cannot be said to be unwilling to work and would have an earning capacity diminished by the injury.* Thus, the worker may establish by preponderance of the evidence an intent to pursue other work interrupted by the job-related injury." (*Gonzales v. Workers' Comp. Appeals Bd., supra,* 68 Cal.App.4th at pp. 847-848, italics added.)

 Applying these principles to the case at bar, it was applicant's industrial injury that removed her from the labor market, *not* the subsequent layoff. The *only* speculative factor recited in this case is the Board's pronouncement that "it would be speculative that applicant would have found employment following the layoff on August 31, 1995, and that such employment would have provided her with an equivalent income to her salary" with Bakery. The Board failed to consider the undisputed evidence of applicant's earnings history, her work history, her actual earnings, her ability to work and her motivation to work. Irrefutably, applicant has established by a

preponderance of the record her ability, opportunity and willingness to pursue other work, but for the interruption of the work-related injury. Accordingly, we need look no further than applicant's actual earnings at the time of injury to determine her earning capacity. Contrary to the Board's implication, there is no evidence in the record that applicant's earnings in 1995 were "atypical or unrepresentative of her true earning capacity." (*Westside Produce Co. v. Workers' Comp. Appeals Bd.*, *supra*, 81 Cal.App.3d at p. 553, citing *Montana*, *supra*, 57 Cal.2d at pp. 596-597.)

We are compelled to conclude that applicant's actual earnings exemplify her earning capacity. She is entitled to have her temporary total disability benefits calculated based upon her average weekly earnings at the time of her injury, as set forth in subdivision (c)(1) and (2) of section 4453.

## II

For injuries occurring on or after January 1, 1990, the Fourth Appellate District has held that when calculating average weekly earnings under section 4453, subdivision (c)(4), section 4453, subdivision (d)[8] only allows consideration of wage increases that are scheduled or reasonably anticipated at the time of injury *and* that would occur during the employee's anticipated duration of temporary disability. (*Grossmont Hospital v. Workers' Comp. Appeals Bd.* (1997) 59 Cal.App.4th 1348, 1362-1363 [69 Cal.Rptr.2d 842].) At the request of the court, the parties filed supplemental letter briefs addressing the relevance of *Grossmont Hospital* to the instant case. We have read *Grossmont Hospital*, reviewed the briefs and determine that the issue before the court in *Grossmont Hospital* concerning application of subdivision (d) of section 4453 is neither before this court nor dispositive to the issues we address. We do not read *Grossmont Hospital* to sanction the Board's action in this case.

## DISPOSITION

The Board's opinion and order granting petition for reconsideration and decision after reconsideration is vacated. The matter is remanded to the

[8]Section 4453, subdivision (d), enacted as part of the Margolin-Bill Greene Workers' Compensation Reform Act of 1989, provides: "Every computation made pursuant to this section beginning January 1, 1990, shall be made only with reference to temporary disability or the permanent disability resulting from an original injury sustained after January 1, 1990. However, all rights existing under this section on January 1, 1990, shall be continued in force. Except as provided in Section 4661.5, disability indemnity benefits shall be calculated according to the limits in this section in effect on the date of injury and shall remain in effect for the duration of any disability resulting from the injury." (Stats. 1989, ch. 892, § 29, pp. 3013-3014.)

Board to reinstate applicant's correct rate of weekly temporary total disability indemnity of $434.34 for the duration of her temporary disability to reflect her actual earnings as well as her earning capacity at the time of injury, consistent with this opinion. Parties will bear their own costs on appeal.

Corrigan, Acting P. J., and Parrilli, J., concurred.