Filed 12/10/18

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

|  |  |
|---|---|
| CITY OF PETALUMA et al., <br><br> Petitioners, <br><br> v. <br><br> THE WORKERS' COMPENSATION APPEALS BOARD OF THE STATE OF CALIFORNIA and AARON LINDH, <br><br> Respondents. | A153811 <br><br> (W.C.A.B. No. ADJ10032593) |

### INTRODUCTION

In 2004, the Legislature made comprehensive changes to the workers' compensation law, one of which altered apportionment of permanent disability such that an employer is now liable only for the percentage of disability directly caused by the employment-related injury. In the instant case, the Qualified Medical Examiner (QME) concluded 85 percent of the claimant's disability was due to a previously asymptomatic, underlying condition. The Administrative Law Judge (ALJ), however, determined no portion of the disability should be apportioned to that condition. The Workers' Compensation Appeals Board (the Board) affirmed, stating the QME had "confused causation of injury with causation of disability." We granted the City's petition for a writ of review and now annul the decision and order an apportioned award.

### BACKGROUND

The parties stipulated that the claimant, Aaron Lindh, was employed as a law enforcement officer when he "sustained injury arising out of and in the course of employment to his left eye." More specifically, Lindh took three to six blows to the left side of his head while engaged in a canine training course. Afterwards, he "suffered

1

severe headaches lasting between several hours to one or two days." Over a month later, while off-duty, Lindh suddenly lost most of the vision in his left eye.

Lindh saw two physicians, one at Kaiser and one at the University of California, San Francisco (UCSF). The Kaiser physician evaluated Lindh as having "a left central vein occlusion and retinal artery occlusion with afferent pupillary defect." The UCSF physician made "a diagnosis of combined central retinal vein occlusion/cilioretinal artery occlusion in the left eye." Neither physician believed the vision loss was related to the blows to his head.

Dr. David Kaye, a neuro-ophthalmologist and the QME who subsequently evaluated Lindh, described Lindh as having "lost the central vision and part of his peripheral vision." He stated in his report and testified at deposition that there were "five diagnoses" pertinent to Lindh—"Presbyopia. Hyperopia. Left ischemic optic neuropathy. Left vitreous fibrosis and some retinal hemorrhages. History of migraine." Dr. Kaye explained that presbyopia and hyperopia are conditions requiring the individual to wear reading glasses or "magnifying lenses." "[L]eft ischemic optic neuropathy" is "a condition in which the circulation to the nerve of the left eye was affected in effect causing a stroke." "[V]itreous fibrosis and some retinal hemorrhages," Dr. Kaye explained as, "when God makes the eye, he packs it full[] of jelly and the jelly sometimes collapses and is replaced with scar tissue as in this case."

Dr. Kaye also concluded, as had the other physicians, that Lindh's "blood circulation to his left eye was defective." He stated Lindh "did not have any disability prior to receiving the blows to the head." And "[a]bsent the injury," he thought Lindh "most likely would have retained a lot of his vision in that eye," although he could not "guess" how much. Dr. Kaye agreed "it [was] possible that [Lindh] could have gone his entire life without losing vision." He also agreed, however, that even had Lindh not suffered the blows to his head, he still could have lost his vision "due to this underlying condition."

As to apportionment, it was Dr. Kaye's "opinion that [Lindh's] underlying vasospastic personality and vasculature placed him at high risk for damage to different

2

parts of his body." He further explained: "So when you ask the question for the cause of injury, causation, I'm required to tell you that he does have an underlying condition, vasospastic type, body type. I'm also required to tell you that the injury contributed to his condition. . . . [¶] With regard to the cause of the disability, the same analysis applies."

At a later point in his testimony, Dr. Kaye reiterated: "I've pointed out to both of you that he has a vasospastic-type personality with a long history of migraine that's associated with this, and the majority of that is from his underlying condition and, yes, at the time of a stress in his life such as at work or being smacked in the head with some dogs, that places him at a much higher risk category and I'm comfortable in my own mind attributing that to the severe loss of vision. [¶] . . . [¶] But not completely as I've tried to make clear." He subsequently repeated it was "unlikely" Lindh would have suffered a vision loss if he had not had the "underlying condition" of "vascular spasticity," a condition that is "rare."

Again, in discussing his initial apportionment of 90 percent (which he adjusted to 85 percent), Dr. Kaye stated, "90 percent [is] due to the underlying condition and 10 percent due to the stress of the injuries," the underlying condition meaning "[v]asospastic-migraine body type." He further agreed his opinion was to a reasonable medical certainty.

While Dr. Kaye had initially apportioned 90 percent of the cause of the disability to Lindh's underlying condition and 10 percent to "the results of the trauma," after reviewing "all the previous data again," he stated both at deposition and in a follow-up to his report that: "[I]t is my professional opinion that 85% of the patient's permanent disability is due to his old condition and 15% of the applicant's permanent disability is due to his industrial injury."[1] (Underscoring omitted.)

---

[1] In his report prior to his deposition, Dr. Kaye discussed apportionment as follows: "Apportionment is indicated at this time. The mechanism is complex and this is my understanding: [¶] [Lindh] has chronic migraine that I believe is on a vasospastic basis. [¶] He has a hyper-reactive type personality. [¶] His work places him in an

The parties stipulated "the medical record, not including apportionment, rates 40 percent permanent disability, and with apportionment, rates six percent permanent disability."

The ALJ rejected Dr. Kaye's apportionment analysis, concluding it was not supported by substantial evidence, and found Lindh had 40 percent permanent disability without apportionment between his underlying condition and the work-related injury.

After granting the City's petition for reconsideration, the Board affirmed the ALJ's decision. As the Board saw it, "Dr. Kaye's opinion establishes that applicant's preexisting hyperreactive type personality and his asymptomatic and . . . preexisting systemic hypertension and vasospasm were mere risk factors that predisposed him to having a left eye injury, but the actual injury and its resultant disability (i.e., the left eye blindness) were entirely caused by industrial factors." (Italics omitted.) "[A]n opinion that bases apportionment upon the percentage to which non-industrial risk factors contributed to causing the injury is not substantial evidence that legally justifies apportionment." (Italics omitted.) The Board concluded Dr. Kaye had "confused causation of injury with causation of disability" and that "there is no legally valid basis for apportionment in this case."

## DISCUSSION

"We review the Board's factual findings for substantial evidence, but we review its legal decisions de novo." (*City of Jackson v. Workers' Comp. Appeals Bd.* (2017)

---

environment that is associated with bouts of acute stress. [¶] This stress precipitated an acute systemic hypertension and vasospasm that affected his left optic nerve vessels. [¶] These vessels were predisposed to closure based on years of migraine. [¶] My research of the literature supports this mechanism. [¶] As such, I apportion at least 90% to this underlying migraine condition, recognizing that the exact mechanism is quite difficult to ascertain. It should be noted that some young people develop a condition called a branch or central vein vasculitis that presents like an adult version of central vein occlusion. It is my opinion that the muzzled dog assault to the left side of his head aggravated his underling condition. Bear in mind that it is possible that this patient had lost some vision prior to this time and was injured by the dog on the left side because he could not see. For this reason, I believe that 90% is due to underlying condition and 10% due to the stress of his injuries."

4

11 Cal.App.5th 109, 114 (*Jackson*).)  If " 'a workers' compensation decision rests on the Board's erroneous interpretation of the law, the reviewing court will annul the decision.' " (*Acme Steel v. Workers' Comp. Appeals Bd.* (2013) 218 Cal.App.4th 1137, 1141 (*Acme Steel*).)

***The 2004 Amendments Concerning Apportionment***

Prior to 2004, "[a]pportionment based on causation was prohibited." (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1326 (*Brodie*).)  Thus, "to the extent that a subsequent industrial injury exacerbated, accelerated, aggravated, or 'lit up' an applicant's preexisting condition, the employer was liable for the resulting disability, without apportionment." (*Escobedo v. Marshalls* (2005) 70 Cal.Comp.Cases 604, 617, fn. 9 (*Escobedo*).)

Accordingly, prior to 2004, "employers were liable for the entire disability if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause alone would not have given rise to a disability.  [Citation.]  Thus, an employer was liable for the entire disability if an industrial injury aggravated a previously existing nonindustrial condition." (*Jackson, supra*, 11 Cal.App.5th at p. 115.)  For example, in *Zemke v. Workmen's Comp. Appeals Bd.* (1968) 68 Cal.2d 794, 796 (*Zemke*), decided before the 2004 amendments, the claimant suffered an injury to his back when he lifted a barrel at work.  Three doctors agreed the claimant had a preexisting "arthritic condition" that was asymptomatic before the injury.  (*Id.* at pp. 797–798.)  The doctors variously described the preexisting condition as osteoarthritic changes and degenerative disc disease.  (*Ibid.*)  The Board, following the doctors' opinion on apportionment, concluded 50 percent of the claimant's disability was attributable to the preexisting condition.  (*Id.* at p. 799.)  The Supreme Court annulled the Board's decision, holding " ' "the employer takes the employee subject to his condition when he enters the employment, and that therefore compensation is not to be denied merely because the workman's physical condition was such as to cause him to suffer a disability from an injury which ordinarily, given a stronger and

5

healthier constitution, would have caused little or no inconvenience." ' " (*Jackson,* at p. 115.)

The 2004 enactment of Senate Bill No. 899 (2003–2004 Reg. Sess.) "overhauled the statutes governing apportionment." (*Brodie*, *supra*, 40 Cal.4th at p. 1323.) The legislation also specified the act was "an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. . . . [¶] In order to provide relief to the state from the effects of the current workers' compensation crisis at the earliest possible time, it is necessary for this act to take effect immediately." (Stats. 2004, ch. 34, § 49; Sen. Bill No. 899 (2003–2004 Reg. Sess.).)

Thus, Labor Code section 4663 now provides in pertinent part: "(a) Apportionment of permanent disability shall be based on causation. [¶] (b) A physician who prepares a report addressing the issue of permanent disability due to a claimed industrial injury shall address in that report the issue of causation of the permanent disability. [¶] (c) In order for a physician's report to be considered complete on the issue of permanent disability, the report must include an apportionment determination. A physician shall make an apportionment determination by finding *what approximate percentage of the permanent disability was caused by the direct result of injury* arising out of and occurring in the course of employment and *what approximate percentage of the permanent disability was caused by other factors both before and subsequent to the industrial injury*, including prior industrial injuries. If the physician is unable to include an apportionment determination in his or her report, the physician shall state the specific reasons why the physician could not make a determination of the effect of that prior condition on the permanent disability arising from the injury. The physician shall then consult with other physicians or refer the employee to another physician from whom the employee is authorized to seek treatment or evaluation in accordance with this division in

6

order to make the final determination." (Lab. Code, § 4663, subds. (a)–(c), italics added.)[2]

Labor Code section 4664, in turn, states: "The employer shall only be liable for the percentage of the permanent disability *directly caused* by the injury arising out of and occurring in the course of employment." (Lab. Code, § 4664, subd. (a), italics added.)

*Cases Applying the Amended Apportionment Statutes*

Given the significant changes to apportionment effectuated by the 2004 legislation, the courts and the Board have, in a number of cases, discussed the "other factors" Labor Code section 4663, subdivision (c), now requires be taken into account in apportionment, making clear that pathology and preexisting, asymptomatic conditions are among such factors.

In *Escobedo*, for example, the Board addressed the 2004 amendments in connection with a claimant who fell and injured her knee at work and was subsequently diagnosed as suffering from degenerative arthritis in her knees. (*Escobedo, supra*, 70 Cal.Comp.Cases at pp. 607–608.)[3] Prior to her injury, the claimant had never consulted a physician about her knees, nor had she been subject to any work restrictions. (*Id.* at p. 608.) The QME determined " 'it [was] medically probable that she would have had fifty percent of her current level of knee disability at the time of today's evaluation even in the absence of her employment. . . .' " (*Ibid.*) Relying on the QME's report, the ALJ apportioned 50 percent of the permanent disability to nonindustrial causation given her preexisting arthritis. (*Id.* at p. 609.)

---

[2] Labor Code section 4663 does not apply to certain presumptively industrially-caused injuries to certain peace officers under Labor Code sections 3212 through 3213.2. (See *Department of Corrections & Rehabilitation v. Workers' Comp. Appeals Bd.* (2008) 166 Cal.App.4th 911, 917.) There is no claim these statutory provisions are relevant here.

[3] *Escobedo* was decided en banc by "the Appeals Board as a whole" because of "the important legal issues presented as to the meaning and application of [new Labor Code] section 4663 with regard to the issue of apportionment of permanent disability based on causation." (*Escobedo, supra*, 70 Cal.Comp.Cases at p. 604.)

The Board discussed the changes brought about by the 2004 amendments at considerable length: "Because the language of [Labor Code] section 4663 does not limit the types of 'other factors' that may be considered as a non-industrial cause of permanent disability, then the 'other factors' may include disability that was apportionable prior to SB 899, i.e., the natural progression of a non-industrial condition or disease, a preexisting disability, or a post-injury disabling event. (See former [Lab. Code,] §§ 4663, 4750, 4750.5.) In addition, the 'other factors' now may include *pathology*, *asymptomatic prior conditions*, and retroactive prophylactic work preclusions, provided there is substantial medical evidence establishing that these other factors have caused permanent disability."[4] (*Escobedo, supra*, 70 Cal.Comp.Cases at p. 617, italics added.)

The Board further observed that under amended Labor Code section 4663, the "issue of the causation of permanent disability, for purposes of apportionment, is distinct from the issue of the causation of the injury. [Citation.] Thus, the percentage to which an applicant's injury is causally related to his or her employment is not necessarily the same as the percentage to which an applicant's permanent disability is causally related to his or her injury." (*Escobedo, supra*, 70 Cal.Comp.Cases at p. 611, italics omitted.)

The Board then addressed "whether an apportionment of permanent disability [could] be made based on the preexisting arthritis in applicant's knees." (*Escobedo, supra*, 70 Cal.Comp.Cases at p. 617.) It concluded that under the new law, "apportionment now can be based on non-industrial pathology, if it can be demonstrated

---

[4] The Board characterized the statutory changes as giving "renewed viability" to older apportionment cases the Supreme Court had expressly rejected, such as *Baker v. Industrial Acc. Com.* (1966) 243 Cal.App.2d 380 (*Baker*). (*Escobedo, supra*, 70 Cal.Comp.Cases at p. 618.) In *Baker*, the claimant, who had worked in various industrial bakeries, eventually suffered from pulmonary emphysema so severe it precluded employment. Several physicians were of the opinion the causes were multiple, including allergic reactions to wheat flour and dust, lifelong smoking and chronic alcoholism. (*Baker*, at pp. 383–384, 387–388.) The Industrial Accident Commission found the claimant suffered from a disability which "derive[d] from both industrial and nonindustrial causes," and the Court of Appeal affirmed an apportioned award. (*Id.* at pp. 390–391 ["all of the factors leading to the petitioner's disability were not produced by an industrial injury"].)

8

by substantial medical evidence that the non-industrial pathology has caused permanent disability." (*Id.* at p. 618.) The Board went on to conclude substantial medical evidence supported apportionment of the claimant's permanent disability to her arthritis, citing the QME's characterization of the " 'trivial nature' " of her at-work injury and his opinion the claimant would have had 50 percent of her current level of knee disability even in the absence of her employment. (*Id.* at p. 622.)

In *Brodie*, our Supreme Court considered a group of five cases in which claimants with prior injuries or preexisting conditions sought permanent disability under the amended law. (*Brodie*, *supra*, 40 Cal.4th at pp. 1317–1319.) The court granted review specifically to determine how permanent disability compensation should be computed when a claimant has "a level of permanent disability and . . . some but not all of that current level of permanent disability is properly apportioned to the most recent industrial injury." (*Id*. at p. 1320.) In the course of deciding that question, the court summarized the changed law on apportionment.

Prior to 2004, "former [Labor Code] section 4663 and case law interpreting the workers' compensation scheme closely circumscribed the bases for apportionment. Apportionment based on causation was prohibited." (*Brodie*, *supra*, 40 Cal.4th at p. 1326.) Accordingly, "a disability resulting from industrial and nonindustrial causes was apportionable 'only if the [B]oard finds that part of the disability would have resulted from the normal progress of the underlying nonindustrial disease.' [Citation.] This rule left employers liable for any portion of a disability that would not have occurred but for the current industrial cause; if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but the nonindustrial cause would not alone have given rise to a disability, no apportionment was to be allowed." (*Ibid.*)

In enacting the 2004 amendments, the Legislature "intended to reverse" a number of the features of the worker's compensation law, including "eliminat[ing] the bar against apportionment based on pathology and asymptomatic causes. . . ." (*Brodie, supra*, 40 Cal.4th at p. 1327.) "[T]he new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current

9

industrial—and decide the amount directly caused by the current industrial source."[5] (*Id.* at p. 1328.)

In *E.L. Yeager Construction v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 922 (*E.L. Yeager*), the Court of Appeal considered a claim by a construction worker who fell and injured his lower back. The QME apportioned 20 percent of the injury to preexisting asymptomatic degenerative disc disease. (*Id.* at p. 925.) The ALJ, however, found no basis for apportionment, and the Board denied reconsideration. (*Id.* at pp. 924–925.) In annulling the award, the appellate court first explained:

> "In 2004, the Legislature made a diametrical change in the law with respect to apportionment to an employee's preexisting injury by enacting Senate Bill No. 899 (2003–2004 Reg. Sess.) (Senate Bill 899). Prior to its repeal by this bill, apportionment under Labor Code former section 4663, was limited to circumstances where the apportioned disability was the result of the natural progression of a preexisting, nonindustrial condition and such nonindustrial disability would have occurred in the absence of the industrial injury. Apportionment based on causation was prohibited. Thus, '[p]rior to 2004, apportionment could never be made on the basis of pathology, either in a case of preexisting disability or in a case of an aggravation of an existing condition; it had to be made on the basis of causation of permanent disability. Many times the reporting physician might find preexisting pathology, such as old x-rays showing asymptomatic spinal changes or heart disease that could not have happened overnight, but these were insufficient, absent actual disability, for apportionment.' (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (rev. 2d ed. 2006) Apportionment—Specific Applications, § 8.06, p. 8–36.1, fns. omitted.) [¶]
>
> " 'The rule under the law prior to [Senate Bill] 899 was "an employer takes the employee as he finds him at the time of the employment. Accordingly, when a subsequent injury lights up or aggravates a previously existing condition resulting in disability, liability for the full disability without proration is imposed upon the employer, and the appeals board may apportion the disability under [former section 4663] 'only in those cases in which part of the disability would have resulted, in the absence of the industrial injury, from the "normal progress" ' of the preexisting disease. [Citations.]" [Citation.] That is, the [Board] was required to

---

[5] With respect to the specific computational issue before it, the high court concluded "formula A," as set forth in *Fuentes v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, was the appropriate one. (*Brodie, supra*, 40 Cal.4th at p. 1324.)

"allow compensation not only for the disability resulting solely from the employment, but also for that which results from the acceleration, aggravation, or 'lighting up' of a prior nondisabling disease." [Citation.] Apportionment was allowed in limited situations, but could not be based on the cause of the disease; "pathology" could not be apportioned. [Citations.]' (*Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd.* (2005) 131 Cal.App.4th 517, 525–526 . . . (*Rio Linda*).) [¶]

" '[Senate Bill] 899 repealed former [Labor Code] section 4663. [Senate Bill] 899 added a new section 4663 and section 4664 affirmatively requiring, among other things, apportionment of permanent disability based on causation and limiting the employer's liability under certain circumstances. [Citations.]' (*Rio Linda, supra*, 131 Cal.App.4th at p. 526. . . .)" (*E.L. Yeager*, *supra*, 145 Cal.App.4th at pp. 926–927, fns. omitted.)

Accordingly, in its answer in *E.L. Yeager*, the Board acknowledged that "apportionment may be based on pathology and asymptomatic prior conditions." (*E.L. Yeager*, *supra*, 145 Cal.App.4th at p. 927.)

The court then turned to the Board's assertion that, nevertheless, the QME's opinion did not constitute substantial evidence necessitating apportionment. (*E.L. Yeager*, *supra*, 145 Cal.App.4th at p. 927.) The court agreed "the mere fact" a physician's report apportions causation is not conclusive, pointing out "to constitute substantial evidence, a medical opinion must be predicated on reasonable medical probability." (*Id.* at pp. 927–928.) Further, "a medical opinion is not substantial evidence if it is based on facts no longer germane, on inadequate medical histories or examinations, on incorrect legal theories, or on surmise, speculation, conjecture, or guess." (*Id*. at p. 928.) However, the court concluded the QME's apportionment opinion suffered from no such inadequacies. (*Id*. at pp. 929–930.)

While the Board complained the QME acknowledged the prior condition had not previously caused any period of disability, the appellate court reiterated that "prior disability or evidence of modified work performance is no longer a prerequisite to apportionment." (*E.L. Yeager*, *supra*, 145 Cal.App.4th at p. 929.) "[D]egenerative disease can be asymptomatic and still apportionable under the new law." (*Ibid.*)

11

The court ultimately concluded, that while "paying lip service" to the new statutory scheme, the Board had rejected the QME's apportionment opinion based on a view of apportionment that was no longer the law. (*E.L. Yeager*, *supra*, 145 Cal.App.4th at p. 930.) In short, the court concluded none of the reasons offered by the Board for rejecting the QME's apportionment opinion was supportable, annulled the Board's decision and remanded for an apportioned award. (*Id.* at pp. 929–931.)

In *Acme Steel, supra*, 218 Cal.App.4th 1137, this court similarly annulled an award that failed to apportion the claimant's disability to nonindustrial factors. In that case, the claimant suffered "continuous trauma injury to his ears" while employed at Acme and eventually had a "100 percent" hearing loss. (*Id*. at p. 1139.) The QME concluded 60 percent of the hearing loss was due to " 'occupational factors, specifically noise[-]induced hearing loss,' " and 40 percent was the result of "non-occupational factors, particularly cochlear degeneration." (*Ibid*.) The ALJ, however, rejected the QME's opinion on apportionment because there had been " 'no earnings loss' " in connection with a prior disability award for hearing loss following an explosion, and the claimant had " 'continued to work.' " (*Id.* at p. 1141.) The Board denied reconsideration. (*Ibid*.)

We annulled the decision, explaining "the [Board] ignored substantial medical evidence . . . showing that [the applicant's] 100 percent loss of hearing could not be attributed solely to the current cumulative trauma. [Citation.] Faced with this unrebutted substantial medical evidence . . . the [Board] should have parceled out the 'causative sources—nonindustrial, prior industrial, current industrial—and decide[d] the amount directly caused by the current industrial course.' " (*Acme Steel, supra*, 218 Cal.App.4th at p. 1143, quoting *Brodie*, *supra*, 40 Cal.4th at p. 1328.) As the court had done in *E.L. Yeager*, we remanded for an apportioned award. (*Acme Steel*, at p. 1144.)

In *Jackson*, the claimant, a police officer, suffered a work-related injury to his neck that required surgery. (*Jackson, supra*, 11 Cal.App.5th at pp. 112–113.) The QME concluded the claimant's disability had multiple causes, including "personal history," which included cervical degenerative disc disease caused in large part by heredity or

12

genetics.  (*Id.* at pp. 113–114.)  The physician apportioned 49 percent of the disability to the claimant's "personal history, 'including "genetic issues,' " and the ALJ issued an apportioned award.  (*Id.* at pp. 113–114.)  The Board reversed and ordered a non-apportioned award.  (*Id.* at p. 114.)  The Court of Appeal annulled the Board's decision and remanded with directions to deny reconsideration, thus affirming the ALJ's apportioned award.  (*Id.* at p. 112.)

The court rejected the Board's assertion that apportioning causation on the basis of " ' "genetics" opens the door to apportionment of disability to impermissible immutable factors.' " (*Jackson, supra*, 11 Cal.App.5th at p. 115.)  As the court pointed out, "[p]recluding apportionment based on 'impermissible immutable factors' would preclude apportionment based on the very factors that the legislation now permits, i.e., apportionment based on pathology and asymptomatic prior conditions for which the worker has an inherited predisposition."  (*Id.* at p. 116.)

The court also rejected the Board's assertion that " '[r]elying upon applicant's genetic makeup' " had caused the QME " 'to apportion the causation of applicant's injury rather than apportionment of the extent of his disability.' " (*Jackson, supra*, 11 Cal.App.5th at pp. 117–118.)  While the court recognized that in *Escobedo*, the Board had commented " 'the percentage to which an applicant's *injury* is causally related to his or her employment is not necessarily the same as the percentage to which an applicant's *permanent disability* is causally related to his or her injury,' " (*id.* at p. 118, quoting *Escobedo, supra*, 70 Cal.Comp.Cases at p. 611), it pointed out the Board had also recognized that "does not mean the two *cannot* be the same."  (*Jackson*, at p. 118, fn. 4, citing *Kos v. Workers' Comp. Appeals Bd.* (2008) 73 Cal.Comp.Cases 529, 533.)  The court further explained that the QME had not engaged in a misdirected apportionment analysis—he had properly determined that the claimant had suffered a cumulative *injury* from repetitive motion, and had then apportioned the claimant's *disability*, that is, his debilitating neck, arm, hand and shoulder pain that prevented him from performing his duties.  (*Jackson*, at p. 118.)  Accordingly, "[c]ontrary to the Board's opinion," the QME "did not apportion causation to injury rather than disability."  (*Ibid.*)

13

The court went on to conclude that the QME's opinion constituted "substantial medical evidence" supporting apportionment. (*Jackson, supra*, 11 Cal.App.5th at p. 119.) "Substantial evidence is relevant evidence a reasonable mind might accept as adequate to support a conclusion. (*Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164. . . .) In *Escobedo, supra*, 70 Cal.Comp.Cases at page 620, the Board opined that in order for a medical opinion to constitute substantial evidence, it must be predicated on reasonable medical probability. It must also set forth the reasoning behind the physician's opinion. (*Id.* at p. 621.) In the context of an apportionment determination, the opinion must 'disclose familiarity with the concepts of apportionment, describe in detail the exact nature of the apportionable disability, and set forth the basis for the opinion, so that the Board can determine whether the physician is properly apportioning under correct legal principles.' (*Ibid.*) A medical opinion must be framed in terms of reasonable medical probability, must not be speculative, must be based on pertinent facts and on adequate examination and history, and must set forth the reasoning in support of its conclusions. (*Ibid.*)" (*Jackson*, at p. 119.)

The QME had examined the claimant and reviewed his medical records. (*Jackson, supra*, 11 Cal.App.5th at p. 113.) She had also reevaluated him after surgery. Her diagnosis remained unchanged, but she changed her apportionment analysis on the basis of several medical publications, which she named and discussed. (*Id.* at pp. 113, 120.) In short, the QME's medical reports met "all the requirements of *Escobedo*" and she "expressly stated that confidence in her opinion was predicated on a reasonable degree of medical probability." (*Id.* at p. 121.) She gave "the reasoning behind her opinion" and "disclosed familiarity with the concept of apportionment." (*Ibid.*) "She explained that the causation of [the claimant's] disability stemmed from work activities with the City, prior work activities, prior personal injuries, and personal history. Included in the causes listed as personal history were 'heritability and genetics' as supported by medical studies, [the claimant's] brief history of smoking, and his prior diagnosis of lateral epicondylitis." (*Ibid.*) Her reports "reflect, without speculation, that [the claimant's] disability is the result of cervical radiculopathy and degenerative disc disease. Her diagnosis was based

14

on medical history, physical examination, and diagnostic studies that included X-rays and MRI's (magnetic resonance imaging scans). She determined that 49 percent of his condition was caused by heredity, genomics, and other personal history factors. Her conclusion was based on medical studies that were cited in her report, in addition to an adequate medical history and examination." (*Ibid.*) Accordingly, the QME's reports were "more than sufficient to meet the standard of substantial medical evidence." (*Ibid.*)

***Apportionment Is Required***

Echoing the contentions made and rejected in these cases, Lindh similarly claims Dr. Kaye's opinion does not constitute substantial medical evidence of apportionment. He asserts Dr. Kaye "did exactly what is prohibited by *Brodie* [] and *Escobedo* [], in that he based the apportionment on risk factors," alone, which cannot support apportionment. He further claims, again citing to *Escobedo*, that Dr. Kaye "confused the issues of causation of injury with the issue of causation of disability."[6]

Lindh points to the following interchange at the outset of Dr. Kaye's deposition as support for his assertions:

> "Q: [¶] Would you agree that Mr. Lindh's migraine headaches in this case are nothing more than a risk factor for losing his eyesight?
> "A: Yes. [¶] . . . [¶] So when you ask the question for the cause of injury, causation, I'm required to tell you that he does have an underlying condition, vasospastic type, body type. [¶] I'm also required to tell you that the injury contributed to his condition. If you want me to put that in legal terms, rely on your experience, I would just suppose this. [¶] *With regard to the cause of the disability, the same analysis applies.*
> "Q: And what is that analysis?
> "A: Absent the injury of March of that year, it's my position that he most likely would have retained a lot of his vision in that eye.
> "Q: Are you able to determine how much of his vision he would have retained?
> "A: No. I can't guess.

---

[6] Amicus California Applicants' Attorney's Association (CAAA), appearing in support of Lindh, advances the same claims. It maintains that the City has erroneously advocated "that the percentage of causation of an injury should be the same as the percentage apportionment" and "that apportionment to risk factors that may never cause any disability is legally permitted." This, says CAAA, "conflates causation of injury with causation of permanent disability."

"Q: Is there any way to determine when he would have begun losing vision without the blows to the head?

"A: No.

"Q: Is it possible that he could have gone his entire life without losing vision?

"A: Yes."

But contrary to Lindh's assertions, this excerpt reflects that Dr. Kaye, in fact, understood the distinction between the causes of an injury and the causes of a disability. What he said was that in this case they were the same, which the Board has recognized can be the case. (*Jackson, supra*, 11 Cal.App.5th at p. 118, fn. 4; see *Escobedo, supra*, 70 Cal.Comp.Cases at p. 613 ["percentage to which an applicant's injury is causally related to his or her employment is *not necessarily* the same as the percentage to which an applicant's permanent disability is causally related to his or her injury," italics added].)

Furthermore, as we have recited at length above, this truncated excerpt does not fairly reflect Dr. Kaye's medical opinion. His subsequent explanation of his diagnoses and opinion as to apportionment makes clear that he attributed Lindh's disability (i.e., impaired vision) to both the work-place injury and an "*underlying condition*."[7] (Italics added.) And when asked about this "underlying condition," Dr. Kaye repeatedly identified it as "vasospastic-type personality." That he also referred to this underlying condition as putting Lindh at "higher risk" of suffering the disability, does not change the fact that Lindh had an *underlying condition* (and one, according to Dr. Kaye, that is

---

[7] While there is no disagreement as to what constituted Lindh's "disability" (i.e., his seriously impaired vision), there is some disagreement as to what constituted his industrial "injury." In the administrative proceedings, the parties stipulated that "on June 16, 2015, applicant sustained industrial left eye injury." That was not the day on which Lindh received the blows to his head, but the day many weeks later, when he was not at work, that he suddenly lost vision. Accordingly, as the parties have used the terms, there is scarcely a distinction between the industrial "injury" and the immediately ensuing "disability." Amici California Workers' Compensation Institute (CWCI) and California Association of Joint Powers Authorities (CAJPA), appearing in support of the City, take a different view—that the workplace "injury" was the trauma to Lindh's head and the "disability" is his impaired vision. However, we need not, and do not, parse the precise meaning of the term "injury" here to resolve this case.

relatively rare) that was, along with the work-place injury, a cause of his impaired vision. Thus, the Board's comment in *Costa* is apt: "Applicant's argument that the WCJ improperly apportioned to a risk factor ignores the medical opinion that applicant's pre-existing congenital condition went beyond being a risk factor to being an actual cause of his increased permanent disability, when applicant sustained his industrial injury." (*Costa v. Workers' Comp. Appeals Bd.* (2011) 76 Cal.Comp.Cases 261, 264; see *State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (2007) 146 Cal.App.4th 1311, 1315 [" ' "[W]hen the Board relies upon the opinion of a particular physician in making its determination, it may not isolate a fragmentary portion of his report . . . and disregard other portions that contradict or nullify the portion relied on; it must give fair consideration to all of his findings. . . ." ' "].)

Lindh also seemingly conflates his asymptomatic condition—vasospasticity personality and vasculature—with his history of migraine headaches, which history he also characterizes as simply a "risk factor." But even if characterized as a "risk factor," his history of migraines reflected an *underlying condition* that in Dr. Kaye's opinion was largely the cause of his loss of vision. Dr. Kaye's opinion was also entirely consistent with the opinion of the treating physicians at UCSF and Kaiser, both of whom were of the opinion it was unlikely the head trauma Lindh sustained at work caused his subsequent loss of vision.

While Lindh purports to acknowledge the post-amendment cases requiring apportionment to nonindustrial causes that, along with an industrial cause, result in a disability, he maintains these cases are "inapplicable" because they "involve[d] degenerative disease . . . [which] implies that there would be some progressive disease process." Because his preexisting asymptomatic condition might "never have resulted in disability or vision loss," Lindh claims his disability cannot be apportioned.

To begin with, Dr. Kaye not only posited that, absent the blows to his head, Lindh might "have gone his entire life without losing vision," he *also* agreed Lindh could have lost his vision, even without the work place trauma, "due to this underlying condition." In short, in Dr. Kaye's view, either outcome might have occurred.

17

More importantly, the post-amendment cases do not require medical evidence that an asymptomatic preexisting condition, in and of itself, would eventually have become symptomatic. Rather, what is required is substantial medical evidence that the asymptomatic condition or pathology was a contributing cause of the disability. (See *Brodie, supra*, 40 Cal.4th at p. 1328 ["the new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source"].)

In fact, Lindh's suggestion that apportionment is required only where there is medical evidence the asymptomatic preexisting condition would invariably have become symptomatic, even without the workplace injury, reflects the state of the law *prior* to the 2004 amendments. As *Jackson* explained, *prior* to the 2004, "employers were liable for the entire disability if the disability arose in part from an interaction between an industrial cause and a nonindustrial cause, but *the nonindustrial cause alone would not have given rise to a disability*. [Citation.] Thus, an employer was liable for the entire disability if an industrial injury aggravated a previously existing nonindustrial condition." (*Jackson, supra*, 11 Cal.App.5th at p. 115, italics added; see *Brodie*, *supra*, 40 Cal.4th at p. 1326; *Escobedo, supra,* 70 Cal.Comp.Cases at p. 614 [under *prior* law, "there must have been medical evidence establishing that some definable portion of the applicant's permanent disability would have occurred as the result of the natural progression of a non-industrial condition or disease, even absent the industrial injury"].)

Under the current law, the salient question is whether the disability resulted from both nonindustrial and industrial causes, and if so, apportionment is required. (See *Brodie, supra*, 40 Cal.4th at p. 1328; *Jackson, supra*, 11 Cal.App.5th at pp. 116–117; *Acme Steel, supra*, 218 Cal.App.4th at p. 1142.) Whether or not an asymptomatic preexisting condition that contributed to the disability would, alone, have inevitably become manifest and resulted in disability, is immaterial.

Thus, while a number of cases have involved asymptomatic preexisting conditions involving a "degenerative" disease, including *Jackson* (cervical degenerative condition

18

caused in large part by heredity and genetics), *Acme Steel* (congenital degeneration of the cochlea), and *E.L. Yeager* (degenerative disease of the lumbar spine), *no* case has suggested that that particular medical terminology is indicative of a legal requirement for apportionment. (See *Jackson, supra*, 11 Cal.App.5th at p. 117 ["We perceive no relevant distinction between allowing apportionment based on a preexisting congenital or pathological condition and allowing apportionment based on a preexisting degenerative condition caused by heredity or genetics."].)

To the contrary, the post-amendment cases uniformly focus on whether there is substantial medical evidence the disability was caused, in part, by nonindustrial factors, which can include "pathology and asymptomatic prior conditions for which the worker has an inherited predisposition."[8] (*Jackson, supra*, 11 Cal.App.5th at p. 116; see

---

[8] At oral argument, the CAAA and Board similarly maintained, in support of Lindh, that an asymptomatic preexisting condition must be "degenerative" in the sense that, even without the industrial injury, the condition would eventually lead to some degree of disability. Accordingly, while the CAAA and Board acknowledged apportionment would be required where, for example, an industrial injury and asymptomatic "degenerative" disc disease both contributed to impaired mobility due to a ruptured disc, they insisted the instant case is different. On questioning, it became apparent the difference lay in their assumption that "degenerative" disc disease would, even without an industrial injury, eventually become symptomatic and cause some degree of impaired mobility. However, we fail to see any material distinction between that ruptured disc example and the instant case. There is no support for their apparent assumption that asymptomatic "degenerative" disc disease will inevitably result in a ruptured disc and restricted mobility. Furthermore, their seeming insistence that there must be medical evidence that an asymptomatic preexisting condition will, in and of itself, naturally progress to disable the claimant, reflects the law *prior* to 2004. None of the cases they cite suggest this continues to be the law. (E.g., *Target Corp. v. W.C.A.B.* (2016) 81 Cal.Comp.Cases 1192, 1193–1194 [physicians failed to provide substantial medical evidence, e.g., failed to explain the how and why, to support apportionment percentages]; *Hikida v. Worker's Comp. Appeals Bd.* (2017) 12 Cal.App.5th 1249, 1252 ["despite significant changes in the law governing workers' compensation in 2004, disability resulting from" surgical procedure for an industrial injury (carpel tunnel syndrome) "for which the employer is responsible is not subject to apportionment"]; *ATC/Vancom, Inc. v. W.C.A.B.* (2014) 79 Cal.Comp.Cases 1329, 1330–1331 [employer did not met its burden of proving claimant's psychiatric disability should be apportioned to nonindustrial factors].)

*Escobedo, supra*, 70 Cal.Comp.Cases at p. 617 [separately listing, and thus distinguishing between, all the "factors" that are apportionable—including those apportionable *prior to 2004* ("the natural progression of a non-industrial condition or disease, a preexisting disability, or a post-injury disabling event") and those apportionable *after 2004 amendments* ("pathology, asymptomatic prior conditions, and retroactive prophylactic work preclusions")].)

There is also no merit to Lindh's claim that there can be no apportionment to a condition that caused no disability prior to the work-related injury. By definition, an asymptomatic preexisting condition has not manifested itself and, thus, by definition has not caused a prior disability. (See *E.L. Yeager, supra*, 145 Cal.App.4th at p. 929 ["[P]rior disability or evidence of modified work performance is no longer a prerequisite to apportionment. If the presence of these factors is necessary to constitute substantial evidence, there would have been no purpose in changing the law."].)

## DISPOSITION

The Workers' Compensation Appeals Board's opinion and decision after reconsideration is annulled, and the matter is remanded to the Board with directions to make an award apportioning Lindh's disability 85 percent to his preexisting condition and 15 percent to his industrial injury.

_____

Banke, J.

We concur:


_____

Humes, P.J.


_____

Margulies, J.


A153811; *City of Petaluma et al. v. Workers' Compensation Appeals Board*

21

Trial Judge:   Hon. Jason E. Schaumberg

Counsel:

Mullen & Filippi, LLP, William E. Davis for Petitioner City of Petaluma.

Ellen Sims Langille for California Workers' Compensation Institute as Amicus Curiae on behalf of Petitioner.

John Frederick Shields Jr. for Respondents Workers' Compensation Appeals Board.

Law Offices of Linda J. Brown, Karina Kowler for Respondent Aaron Lindh.

Gearheart & Sonnicksen, Mark Gearheart for California Applicants' Attorney Association as Amicus Curiae on behalf of Respondent Aaron Lindh.