Filed 5/27/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>      Petitioner,<br><br>      v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and BARBARA JUSTICE,<br><br>      Respondents. | H046562<br>(W.C.A.B. No. ADJ9339549) |

Petitioner County of Santa Clara petitioned this court for review of the decision of respondent Workers' Compensation Appeals Board (WCAB or the Board) affirming an unapportioned permanent disability award in favor of respondent Barbara Justice. Petitioner contends that the Board erred in determining no apportionment was warranted as a matter of law.

We issued a writ of review and now conclude that the permanent disability in this case should have been apportioned between industrial and nonindustrial causes. We therefore annul the Board's decision to the contrary and remand for further proceedings.

**I. Facts and Procedural Background**

Barbara Justice was employed as a workers' compensation claims adjuster for petitioner from November 1991 until she retired in December 2016. On November 22, 2011, Justice fell at work and suffered an injury to her left knee. After Justice injured her left knee, she developed pain and problems in her right knee, which

was found to be a compensable consequence of the injury to her left knee. In June 2012, Justice had total knee replacement surgery on the right knee. In September 2013, she had total knee replacement surgery on her left knee.

The parties arranged for Justice to be examined by Dr. Mark Anderson, an orthopedic surgeon, who served as an agreed medical examiner. Dr. Anderson prepared his initial report in March 2016. He prepared five supplemental reports and was deposed twice.

Dr. Anderson testified that an X-ray of Justice's knees, taken on November 28, 2011, showed "marked osteoarthritis" of the knees. An MRI conducted on January 18, 2012, showed that Justice had suffered a medial and lateral meniscal tear as a result of the fall at work. The MRI also revealed significant preexisting degeneration, all of which predated the fall at work: an "old" tear of the anterior cruciate ligament, "marked loss of articular cartilage in the medial compartment," "moderate loss of articular cartilage in the lateral compartment," and "moderate loss in the patellofemoral joint." There was also scar tissue on both knees indicating that Justice had undergone a "significant open procedure" at some point in the past.

Based on Justice's medical history, Dr. Anderson testified that there was significant preinjury degeneration in both knees. In response to questions on what precipitated the need for total knee replacement surgery, Dr. Anderson agreed that "[t]otal knee replacement [was] not required because of the meniscus tear . . . but rather as a result of the underlying arthritis," because "[a] meniscal tear does not require a knee replacement." Rather, Dr. Anderson determined that the fall at work "hasten[ed]" the need for total knee replacement surgery by "lighting up the underlying pathology." Dr. Anderson opined that "[a]bsent the underlying pre-existing arthritis, is it medically probable that [Justice] would not have had total knee replacement as she did when she

did . . . ." As a result, Dr. Anderson apportioned 50 percent of the bilateral knee disability to the nonindustrial, preexisting degeneration in the knees.

The workers' compensation judge determined that Justice had sustained permanent partial disability of 48 percent, which was worth $59,110.00. In pertinent part, the workers' compensation judge found that Justice "suffered from knee trouble due to degenerative arthritis for many years prior to her [2011] industrial injury. The available medical evidence makes plain that this condition played a large role in making the effects of the industrial injury significantly worse than they would . . . otherwise have been, both in the need for treatment . . . and in the ultimate [permanent disability] . . . . The injury precipitated the need for bilateral knee replacement surgery. These surgeries had been in contemplation at varying levels of urgency for some years prior to the injury, but as a result of the injury became practically mandatory. There is no doubt on this evidence that the need for these surgeries was at least partially non-industrial. There also seems to be little doubt that had the injuries and attendant surgeries never occurred, [Justice] would still now suffer from a non-trivial level of impairment from her arthritic knees."

The workers' compensation judge further found that "[t]he available medical evidence also indicates that, in terms of function, the surgeries were quite successful. While by no means curative, the surgeries appear to have significantly increased [Justice's] ability to walk and engage in weight-bearing activities. Under the pre-2005 [Permanent Disability Rating Schedule (PDRS)] one suspects that the surgeries would have significantly decreased [her] work limitations and increased her ability to engage in gainful activity, resulting in a lower [permanent disability] rating. Since the current PDRS is based not upon functional capacity but upon diagnosis, the surgery has resulted in an impairment rating substantially higher than it was pre-surgery. The only real cause of this change in impairment rating was the surgery, in turn brought about by a

3

combination of industrial and non-industrial factors. The [agreed medical examiner] . . . , thought the [permanent disability] should be apportioned 50/50. I believe his basis for that conclusion was sound and in accordance" with the law.

The workers' compensation judge then stated that prior to the decision in *Hikida v. Workers' Comp. Appeals Bd.* (2017) 12 Cal.App.5th 1249 (*Hikida*), he would "have issued a decision awarding [permanent disability] with 50% apportionment based upon Dr. Anderson's opinion." However, the workers' compensation judge understood *Hikida* to preclude apportionment in this case: "*Hikida* holds that where medical treatment (here, the bilateral knee replacement surgery) results in an increase in [permanent disability], [permanent disability] should be awarded without apportionment." The workers' compensation judge emphasized that he was bound by the *Hikida* decision: "While the reasons why the *Hikida* court made a significant change in the law are obscure to me, they are as beyond the scope of a trial judge as is the argument that the case was wrongfully decided. While I cannot tell *why* the Court concluded as it did, *what* they did is readily apparent, and I have no option but to follow this binding precedent." Accordingly, the workers' compensation judge awarded permanent disability with no apportionment.

Petitioner sought reconsideration with the Board, arguing that the workers' compensation judge erroneously applied *Hikida* to the facts of this case. The workers' compensation judge issued a report and recommendation on the petition for reconsideration, recommending that the Board deny reconsideration. The workers' compensation judge reiterated that "but for the rule first announced in *Hikida*," "the parties agree that . . . Dr. Anderson's apportionment would have been sufficient" to sustain a finding of 50 percent apportionment of Justice's permanent disability. The workers' compensation judge determined, however, that "*Hikida* is not distinguishable from this case," and stated that "it is far beyond the scope of a WCAB trial judge to

4

decide whether a published Court of Appeal decision was based upon sound policy or otherwise." The Board ultimately granted reconsideration, but only to amend the award to correct a clerical error. The Board rejected the merits of the petition for reconsideration on the apportionment issue for the reasons stated in the workers' compensation judge's report, which it adopted and incorporated as its decision.

## II. Discussion
### A. Standard of Review

" 'We review the Board's factual findings for substantial evidence, but we review its legal decisions de novo.' [Citation.] If ' "a workers' compensation decision rests on the Board's erroneous interpretation of the law, the reviewing court will annul the decision." ' [Citation.]" (*City of Petaluma v. Workers' Comp. Appeals Bd.* (2018) 29 Cal.App.5th 1175, 1181-1182 (*Petaluma*).)

### B. Apportionment of Permanent Disability

In 2004, the Legislature enacted Senate Bill No. 899 (2003-2004 Reg. Sess.) (Senate Bill No. 899), which made substantial changes to workers' compensation law, including the law of apportionment of permanent disability. Senate Bill No. 899 was an "urgency measure designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1329 (*Brodie*).) Before the 2004 amendments, apportionment "based on causation was prohibited." (*Id.* at p. 1326.) This meant that in some cases "to the extent that a subsequent industrial injury exacerbated, accelerated, aggravated, or 'lit up' an applicant's preexisting condition, the employer was liable for the resulting disability, without apportionment." (*Escobedo v. Marshalls* (2005) 70 Cal.Comp.Cases 604, 617, fn. 9 (*Escobedo*); *Marsh v. Workers' Comp. Appeals Bd.* (2005) 130 Cal.App.4th 906,

912.) Thus, before Senate Bill No. 899, apportionment based on causation was "limited to circumstances where the apportioned disability was the result of the natural progression of a preexisting, nonindustrial condition and such nonindustrial disability would have occurred in the absence of the industrial injury." (*E.L. Yeager Construction v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 922, 926.)

With Senate Bill No. 899, the Legislature "overhauled the statutes governing apportionment." (*Brodie*, *supra*, 40 Cal.4th at p. 1323.) Labor Code section 4663 now provides that "[a]pportionment of permanent disability shall be based on causation."[1] Section 4664, subdivision (a), in turn, provides that "[t]he employer shall only be liable for the percentage of permanent disability directly caused by the" industrial injury. "[T]he new approach to apportionment is to look at the current disability and parcel out its causative sources—nonindustrial, prior industrial, current industrial—and decide the amount directly caused by the current industrial source." (*Brodie*, *supra*, 40 Cal.4th at p. 1328.) "The issue of the causation of permanent disability, for purposes of apportionment, is distinct from the issue of the causation of an injury. [Citation.] Thus, the percentage to which an applicant's *injury* is causally related to his or her employment is not necessarily the same as the percentage to which an applicant's *permanent disability* is causally related to his or her injury." (*Escobedo*, *supra*, 70 Cal.Comp.Cases at p. 611.)

Section 4663, subdivision (b) requires that "[a] physician who prepares a report addressing the issue of permanent disability due to a claimed industrial injury shall address in that report the issue of causation of the permanent disability." "In order for a physician's report to be considered complete on the issue of permanent disability, the report must include an apportionment determination. A physician shall make an apportionment determination by finding what approximate percentage of the permanent disability was caused by the direct result of injury arising out of and occurring in the

---

[1] Subsequent statutory references are to the Labor Code.

6

course of employment and what approximate percentage of the permanent disability was caused by other factors both before and subsequent to the industrial injury, including prior industrial injuries." (§ 4663, subd. (c).) These "'"other factors" now may include *pathology*, *asymptomatic prior conditions*, and retroactive prophylactic work preclusions, provided there is substantial medical evidence establishing that these other factors have caused permanent disability.'" (*Petaluma*, *supra*, 29 Cal.App.5th at p. 1184.)

## C.  The *Hikida* Decision

In *Hikida*, the injured worker was diagnosed with carpal tunnel syndrome. (*Hikida*, *supra*, 12 Cal.App.5th at p. 1252.)  She underwent carpal tunnel surgery to treat the condition.  (*Id.* at pp. 1252-1253.)  "Following the surgery, [the injured worker] developed chronic regional pain syndrome (CRPS), a condition that caused her debilitating pain in her upper extremities and severely impaired her ability to function." (*Id.* at p. 1253.)  The agreed medical examiner found the injured worker to be "permanently and totally disabled from the labor market."  (*Ibid*.)  He further found "her permanent total disability was due entirely to the effects of the CRPS that she developed as a result of the failed carpal tunnel surgery.  He further concluded that [her] carpal tunnel condition itself was 90 percent due to industrial factors and 10 percent to nonindustrial factors."  (*Ibid.*)  The workers' compensation judge "found that [the injured worker's] permanent total disability was 90 percent due to industrial factors, 'after adjustment for apportionment.'"  The injured worker sought reconsideration, "contending her disability was 100 percent industrial because it derived from medical treatment, entitling her to an unapportioned award."  (*Ibid.*)  The Board affirmed the workers' compensation judge's apportionment finding, noting that "'there is a basis for apportionment of that permanent disability to nonindustrial causative sources . . . because

7

the CRPS was caused by the surgery to treat [the injured worker's] carpal tunnel condition.'" (*Ibid*.)

The Second District Court of Appeal issued a writ of review and annulled the Board's decision, concluding that the injured worker was entitled to a permanent disability award without apportionment. (*Hikida*, *supra*, 12 Cal.App.5th at p. 1252.) The court first discussed the longstanding rule that medical treatment for an industrial injury is "'not apportionable'" and that an employer is required to pay for "all medical treatment '[o]nce it has been established that an industrial injury contributed to an employee's need for [it] . . . .'" (*Id.* at p. 1261.) It then explained that that "[i]t also has long been the rule that 'the aggravation of an industrial injury or the infliction of a new injury resulting from its treatment or examination are compensable" under the workers' compensation system. (*Ibid.*) From these two principles, the court concluded: "[T]here is no dispute that the disabling carpal tunnel syndrome from which [the] petitioner suffered was largely the result of her many years of clerical work with Costco. It followed that Costco was required to provide medical treatment to resolve the problem, without apportionment. The surgery went badly, leaving [the] petitioner with a far more disabling condition— CRPS—that will never be alleviated. California workers' compensation law relieves Costco of liability for any negligence in the provision of the medical treatment that led to [the] petitioner's CRPS. It does not relieve Costco of the obligation to compensate [the] petitioner for this disability without apportionment." (*Id.* at p. 1262.)

In addressing the Legislature's 2004 overhaul of the apportionment of permanent disability, the Second District stated that based on its "review of the authorities," it was clear that "the Legislature did not intend to transform the law requiring employers to pay for all medical treatment caused by an industrial injury, including the foreseeable consequences of such medical treatment." (*Hikida*, *supra*, 12 Cal.App.5th at p. 1262.) The court reasoned that while the apportionment rule was based on statute, "[t]he long-

8

standing rule that employers are responsible for all medical treatment necessitated in any part by an industrial injury, including new injuries resulting from that medical treatment, derived not from those statutes" but from these two principles: (1) medical care for industrial injuries must be provided without apportionment, and (2) the consequences of that medical care are covered by the workers' compensation system. (*Id.* at pp. 1262-1263.) Thus, the court determined that "the [workers' compensation judge] erred in relying on the 2004 amendment to support apportioning petitioner's award, and the Board erred in upholding his decision." (*Id.* at p. 1263.)

## D. Analysis

Petitioner contends that the workers' compensation judge and the Board erred in determining that Justice's permanent disability should not be apportioned.

We agree with petitioner that apportionment of Justice's permanent disability was required. *Petaluma* is instructive. In that case, police officer Aaron Lindh was engaged in a canine training exercise at work when he "took three to six blows to the left side of his head . . . ." (*Petaluma*, *supra*, 29 Cal.App.5th at p. 1179.) He first suffered severe headaches, and weeks later "suddenly lost most of the vision in his left eye." (*Ibid.*) The qualified medical examiner[2] found that Lindh had a congenital abnormality that caused poor blood circulation in his left eye. (*Id.* at pp. 1179-1180.) The examiner opined that without the injury, Lindh "'most likely would have retained a lot of his vision in that eye,' although he could not 'guess' how much." (*Id.* at p. 1180.) He emphasized that it was "'unlikely' Lindh would have suffered a vision loss if he had not had the 'underlying condition'" in his left eye. (*Ibid.*) Thus, the examiner apportioned 85 percent of the permanent disability to the preexisting condition, and 15 percent to the industrial injury.

---

[2] A party may designate a physician as a qualified medical examiner. When the parties agree on the same examiner, that examiner is an agreed medical examiner.

9

(*Id.* at pp. 1180-1181.) However, the workers' compensation judge found that no apportionment was warranted, and the Board affirmed that finding, stating that the underlying condition was merely a "'risk factor[] that predisposed [Lindh] to having a left eye injury, but the actual injury and its resultant disability (i.e., the left eye blindness) were entirely caused by industrial factors.'" (*Id.* at p. 1181.)

On review, the First District Court of Appeal annulled the Board's decision, concluding that apportionment was appropriate because there was substantial medical evidence that the asymptomatic condition or pathology was a contributing cause of the disability. (*Petaluma*, *supra*, 29 Cal.App.5th at p. 1193.) The court explained that the 2004 amendments concerning apportionment had been designed to expand apportionment to include nonindustrial factors, "making clear that pathology and preexisting, asymptomatic conditions are among such factors." (*Id.* at p. 1183.) According to the court, after the 2004 amendments, "the salient question is whether the disability resulted from both nonindustrial and industrial causes, and if so, apportionment is required." (*Id.* at p. 1193.) In that respect, the court found that the medical evidence was clear that "Lindh had an *underlying condition* . . . that was, along with the workplace injury, a cause of his impaired vision." (*Id.* at p. 1192.) The court concluded that substantial medical evidence supported the qualified medical examiner's apportionment finding that Lindh's permanent disability was caused 85 percent by his preexisting condition and 15 percent by his industrial injury. (*Id.* at pp. 1192-1193, 1195.)

As in *Petaluma*, the injured worker in the instant case had an extensive preexisting pathology that when combined with an industrial injury, led to permanent disability. The preexisting pathology was well documented. Dr. Anderson opined that "[a]bsent the underlying pre-existing arthritis, [it was] medically probable that [Justice] would not have had total knee replacement" when she did. While the fall at work "hasten[ed] . . . the need for the replacement," the unrebutted medical evidence established that the

10

underlying pathology was a substantial causal factor in the permanent disability. Where there is unrebutted substantial medical evidence that nonindustrial factors played a causal role in producing the permanent disability, the Labor Code demands that the permanent disability "*shall*" be apportioned. (§ 4663, subd. (a), italics added; *Petaluma*, *supra*, 29 Cal.App.5th at p. 1184; see also *Acme Steel v. Workers' Comp. Appeals Bd.* (2013) 218 Cal.App.4th 1137, 1143 ["Faced with this unrebutted substantial medical evidence . . . the [Board] should have parceled out the 'causative sources . . . and decide[d] the amount directly caused by the current industrial source.'"].) Here, the agreed medical examiner's initial report, five supplemental reports, and two depositions were unrebutted and constituted substantial medical evidence that Justice's preexisting knee pathology was a significant causal factor in producing her permanent disability following total knee replacement surgery.

The workers' compensation judge and the Board believed that *Hikida* dictated a different result. Not so. The injured worker in *Hikida* suffered from carpal tunnel syndrome and underwent industrial medical treatment as a result. (*Hikida*, *supra*, 12 Cal.App.5th at p. 1253.) As a consequence of the medical treatment, the injured worker sustained a new "more disabling condition" of CRPS. (*Id.* at p. 1262.) The *Hikida* court reasoned that the employer was responsible for this new consequential injury based on longstanding case law requiring employers to pay for all industrial medical treatment without apportionment. (*Hikida*, at p. 1262; see *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 142 ["Once employment and industrial causation are determined, the employer is responsible for *all* medical expenses incurred."].) The court also determined, again based on longstanding case law, that the consequences of such medical treatment were also within the ambit of the workers' compensation system. (*Hikida*, at pp. 1262-1263; see *Fitzpatrick v. Fidelity & Casualty Co.* (1936) 7 Cal.2d 230, 233 ["[A]n employee is entitled to compensation for a new or

11

aggravated injury which results from the medical or surgical treatment of an industrial injury."].)

Both of these principles are correct statements of the law. However, it does not follow that an employer is responsible for the consequences of medical treatment without apportionment, when that consequence is permanent disability. Sections 4663 and 4664 make clear that permanent disability "shall" be apportioned and that an employer "shall" be liable only for the percentage of the permanent disability "directly caused" by industrial injury. There is no case or statute that stands for the principle that permanent disability that follows medical treatment is not subject to the requirement of determining causation and thus apportionment, and in fact such a principle is flatly contradicted by sections 4663 and 4664.

Understood in context, the *Hikida* court's conclusion that there should be no apportionment makes sense only because the medical treatment in *Hikida* resulted in a *new* compensable consequential injury, namely CRPS, which was *entirely* the result of the industrial medical treatment. It was this new compensable consequential injury that, in turn, led *entirely* to the injured worker's permanent disability. The agreed medical examiner's findings underlined this point, as he determined that the injured worker's "permanent total disability was due *entirely* to the effects of the CRPS that she developed as a result of the failed carpal tunnel surgery." (*Hikida*, *supra*, 12 Cal.App.5th at p. 1253, italics added.) Although parts of the *Hikida* opinion can be read to announce a broader rule that there should be no apportionment when medical treatment increases or precedes permanent disability, it is clear that the rule is actually much narrower. Put differently, *Hikida* precludes apportionment only where the industrial medical treatment is the sole cause of the permanent disability.

In contrast to *Hikida*, the permanent disability in this case was not caused entirely by the industrial medical treatment. The medical treatment did not result in a new,

12

unexpected compensable consequential injury. Rather, the surgery was "quite successful," and it "significantly increase[d]" Justice's "ability to walk and engage in weight-bearing activities." Based on a careful review of Justice's medical history, Dr. Anderson found that the permanent disability was caused 50 percent by industrial factors and 50 percent by nonindustrial factors. Sections 4663 and 4664 plainly require that the permanent disability be apportioned among industrial and nonindustrial factors if unrebutted substantial medical evidence supports an apportionment finding. Here, Dr. Anderson's findings constitute unrebutted substantial medical evidence. It was error for the workers' compensation judge and the Board to ignore unrebutted substantial medical evidence that nonindustrial factors, in part, caused Justice's permanent disability.

Respondent Justice argues that notwithstanding *Hikida*, the award with no apportionment was correct under the law.[3] She contends that she had worked for 20 years without any discussion of a need for total knee replacement, that the fall at work was the "precipitating event" leading to the need for total knee replacement surgery, and that therefore the total knee replacement was "directly caused by the work injury." Because the total knee replacement provided the sole basis for the disability rating, Justice contends that it was appropriate to conclude that there should be no apportionment. According to her, "neither knee surgeries [*sic*] would have occurred if [she] had not fallen" at work.

Justice's arguments are misplaced. "Whether or not an asymptomatic preexisting condition that contributed to the disability would, alone, have inevitably become manifest and resulted in disability, is immaterial." (*Petaluma*, *supra*, 29 Cal.App.5th at p. 1193.) Although she is correct that an employer is responsible for the portion of the permanent disability "directly caused" by industrial factors, implicit in this inquiry is a

---

[3] Only Justice has filed an answer and response in this court. Respondent WCAB declined to file an answer to the petition for writ of review, and declined to file a response to this court's order to granting the petition for writ of review.

determination of whether other nonindustrial factors also *indirectly* caused the permanent disability. In this case, Dr. Anderson concluded that Justice had significant nonindustrial preexisting knee degeneration, which caused 50 percent of the postsurgical permanent disability. Whether or not the workplace injury "directly caused" the need for surgery, the apportionment statutes nevertheless demand that the disability be sorted among direct and indirect causal factors. In this case, there was unrebutted substantial medical evidence that Justice's permanent disability was caused, in part, by an extensive preexisting knee pathology. Apportionment was therefore required.

### III. Disposition

The Workers' Compensation Appeals Board's decision is annulled, and the matter is remanded to the Board with directions to make an award apportioning Justice's permanent disability 50 percent to nonindustrial factors and 50 percent to her industrial injury.

_____
                             Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Elia, J.

County of Santa Clara v. Workers' Comp. Appeals Bd.
H046562

15

| | |
|---|---|
| Trial Court: | Workers' Compensation Appeals Board |
| Attorney for Petitioner: | Mark A. Cartier<br>Thomas, Lyding, Artier, Arnone, & Daily, LLP |
| Attorneys for Respondents: | Allison Jane Fairchild<br>Workers' Compensation Appeals Board |
| | Todd A. Johnson<br>Butts & Johnson |
| Attorney for Amicus Curiae<br>California Workers' Compensation<br>Institute and California Chamber<br>of Commerce: | Ellen Sims Langille<br>California Workers' Compensation Institute |
| Attorneys for Amicus Curiae<br>California Applicant's Attorneys<br>Association: | Justin Carl Sonnicksen<br>Gearheart & Sonnicksen |
| | William Herreras |